**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | |
|---|---|
| **SCHYLER Z. GRODMAN, M.D.,** | **CIVIL ACTION NO.** |
| Plaintiff, | |
| **v.** | |
| **TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER** | |
| Defendant. | **JURY TRIAL DEMANDED** |

## ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff Schyler Grodman, M.D. ("Grodman") files this Original Complaint against Defendant Texas Tech University Health Sciences Center ("Defendant"), because Defendant discriminated against Grodman based on his disability, and hereby states as follows:

### I.  JURISDICTION AND VENUE

1. This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and supplemental jurisdiction pursuant to 28 U.S.C. §§ 1367.

2. Venue is proper in the Northern District of Texas, Lubbock Division because the causes of action alleged occurred within this District.

3. Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  The EEOC issued a right to sue letter on June 13, 2023.  *See* Ex. A (EEOC Determination and Notice of Rights).  Plaintiff files this suit within (90) days of receiving the Notice of Right to Sue from the EEOC.

### II.  THE PARTIES

4. At all relevant times, Grodman was a resident of the State of Texas.  Grodman resides in the State of New Jersey.

5.      Defendant is a state-related university which receives federal financial assistance located at 3601 4th Street, Lubbock Texas 79430.

### III.      VICARIOUS LIABILITY-RESPONDEAT SUPERIOR

6.      Whenever in this pleading it is alleged that Defendant or its agents or employees did any act or thing, or failed to do any act or thing, it is meant that Defendant's vice principals, officers, Clinical Competency Committee ("Committee") members, servants, employees, agents, or representatives did any act or thing, or failed to do such act or thing, or that such act or thing or omission was done in the course and scope of that person's employment at Defendant, and/or in the furtherance of Defendant's interests, or with the full authorization, permission, tolerance, and/or ratification of Defendant was done in the normal routine of the accepted, tolerated, or permitted conduct, customs, and/or practices of Defendant's officers, owners, servants, employees, and/or representatives.

7.      Defendant's discriminatory actions against Grodman in the relevant period were principally brought about by and through Dr. Samer Zaid-Kaylani ("Kaylani"), the former director of Defendant's Pediatrics Residency Program, and various members of Defendant's faculty and Committee including: Dr. Anders Leverton, Dr. Smita Bhaskaran, Dr. Shannon Dr. Herrick, Dr. Stacy Steans, Dr. Srilatha Alapati, Dr. Olubunkunola Adesanya, Dr. Muhammad Subhani, Dr. Enas Shanshen, Dr. Johnnie Faircloth, Dr. Jenda Arawiran, Dr. Alison Lunsford, and Dr. Mandy Griffin.

### IV.      FACTS

**A.      Grodman's Disabilities and Symptoms.**

8.      Grodman is disabled and has been diagnosed with the following conditions: attention deficit hyperactivity disorder ("ADHD"), Autism Spectrum Disorder ("ASD"), depression, and social anxiety.  Grodman was clinically diagnosed with ADHD when he was three

years old and has taken ADHD medication for his condition since he was five.  At the time of Grodman's dismissal by Defendant, he was at the near maximal 24 hour recommended dosage of his medication.

9.      Grodman's disability includes the combination of the effects of Grodman's ADHD, along with his ASD, anxiety, and depression diagnosis—all of which impact Grodman's major life activities separately and by exacerbating Grodman's symptoms related to his ADHD.

10.     Grodman's ADHD substantially limits one or more of Grodman's major life activities, including his learning, memory, sleep, and productivity.  In its active state, and in the absence of mitigating measures like sufficient medication, Grodman's ADHD condition significantly limits Grodman's major life activities.  It severely restricts Grodman's concentration and memory.  Grodman's ADHD medication also impacts and affects his major life activities including work and his personal life.  Grodman's common ADHD symptoms include depression, anxiety, social withdrawal, impaired concentration, memory problems, fatigue, and physical and emotional reactions, including increased negative symptoms as the medication's effect wears or when the dosage is insufficient (causing Grodman to have to adjust dosages from time to time). In addition, the medication has side effects that substantially limit his sleeping and wakefulness.

11.     As a consequence of his disabilities, Grodman sometimes requires accommodations in the form of extended time to complete particular tasks.  And based on the facts above, at all relevant times, Grodman was a person with an "actual" disability, a "record of" disability, and a "regarded-as" disability, as defined by the ADA as amended, and by Chapter 21, as amended.

12.     In spite of these diagnoses, and with reasonable accommodations, Grodman completed his undergraduate at the University of Pennsylvania, a Pre-Med Post-Baccalaureate Program at Columbia University, and medical school at the College of Physicians and Surgeons

at Columbia University, where he also received a masters degree. He also obtained accommodations from the USMLE/NBME for the Step examinations and graduate school admissions testing.

**B.    Relevant Employment and Time Period.**

13.    Defendant operates a Pediatric Residency Program (hereinafter the "Program"), the mission and purpose of which is education. Residents of the Program are employed by Defendant. Grodman was hired by Defendant to work in the Program as a Resident in 2019.  Defendant terminated Grodman's employment on or around January 7, 2022.  The acts of discrimination and retaliation at the basis of this complaint occurred from the time of Grodman's hiring by Defendant to the date that Grodman's termination was reviewed and wrongfully upheld by Defendant's Appeal Review Subcommittee, on or around April 2022.  During all relevant times, Kaylani remained the Program Director.

14.    As a Resident of the Program, Grodman's duties (at the time the discrimination occurred) included being responsible for coordinating the care of multiple pediatric patients on the team Grodman was assigned to.  Grodman also performed the initial assessments of the patients and actively participated in all aspects of pediatric patient treatment and care, including history and physical, diagnostic and therapeutic planning, procedures, writing orders, interactions with family, and maintaining medical records.

**C.    Defendant's Awareness of Grodman's Disability.**

15.    During the first two years, Kaylani also worked extensively with Grodman as the program director.  Kaylani asked questions about Grodman's health conditions and disabilities. At one point, Kaylani even confessed that Grodman shared attributes with his daughter, describing them as both bright but with "social issues."  Grodman was uncomfortable sharing details of his

disabilities but disclosed his diagnosed disabilities, including his ADHD diagnosis, his struggle to adjust his medications, and the nature of the impact that his disabilities had on his personal life and work.

16.     Since the beginning of his work, Grodman also disclosed that he received accommodations including extra time on all standardized testing and all USMLE exams, to which Kaylani expressed no knowledge.  Grodman also disclosed his disability to his designated mentor, Dr. Sharon Herrick ("Herrick") who was and remains the Chair of the Pediatrics Department at Texas Tech-Amarillo as well to Dr. Angelo Wong ("Wong"), a development Pediatrician during his rotation through her service in his first year of residency.

17.     Upon information and belief, Kaylani also informed all program leadership about Grodman's disabilities, or all program leadership became aware of Grodman's disabilities independently.  Thus, Defendant no doubt had knowledge of Grodman's disabilities, or otherwise recognized his behaviors as symptomatic of his disabilities. *See, e.g.,* February 7, 2021 email from Dr. Shanshen (a member of the leadership committee of Defendant) observing that "I think there are some ***behavioral/psychiatric issues*** as well that might be affecting [Grodman's] performance." (emphasis added).

18.     Defendant was aware of Grodman's disabilities and the impact those disabilities had on Grodman's ability to perform his obligations.  During Grodman's first two years of his residency, and after Grodman disclosed the nature of his disabilities to Defendant, Grodman received several informal accommodations from Defendant.  Kaylani also knew that Grodman had been given extra time on exams throughout medical school and on all licensing examinations. With this knowledge, Defendant, by and through Kaylani, represented to Grodman that no such accommodations were necessary, and that the results of the internal examinations were for

educational purposes only and that those scores "would never be used against [Grodman]." Finally, Defendant also knew that Grodman was already on ADHD medication and that, given the duration of action of the medications, long stretches of scheduled work needed to be carefully monitored.

19.     Given Defendant's knowledge of Grodman's disabilities, and especially during Grodman's second year, Defendant provided informal accommodations tailored to Grodman's disabilities and requests, including but not limited to:

- additional regular meetings with Grodman's mentor;

- supervised calls and close monitoring, including additional review of all orders;

- built-in, additional, detailed feedback from faculty and supervisors, (which Grodman continually requested);

- major scheduling adjustments, including accommodated rotation scheduling;

- planned, additional Committee meetings to discuss Grodman's progress; and

- supplemental meetings, phone calls, and talks to discuss call preparation.

20.     With the help of these tailored accommodations, and through his own determination, Grodman's work performance during his first two years of residency was satisfactory (Grodman was promoted twice).  And given these prior experiences, Dr. Grodman reasonably expected the Program to be responsive and collaborative regarding accommodations.

21.     At the end of his second year, Grodman was fully supported for competitive fellowship applications.  In fact, after Grodman's successful promotion to the third and final year of his residency, both Kaylani, the Department Director, and Dr. Herrick, the Department Chair, wrote positive letters of recommendation supporting Grodman's candidacy for a post-graduation pediatric fellowship.

**D.**     **Grodman's Final Year of Residency.**

22.     On August 28, 2021, during Grodman's final year of residency, Grodman tore his Achilles tendon during a soccer game organized by Kaylani.  Despite the injury, Grodman fulfilled full duties as a resident, using a walking boot, until surgery, after which he requested and was given time off.  Afterward, Grodman was limited to utilizing a scooter to always get around until early October when he was permitted to use crutches.  At that time, he needed to undergo physical therapy until around Thanksgiving without any diminution of responsibilities.

23.     In addition, from September 8, 2021 to October 14, 2021, Grodman had almost a dozen post-residency fellowship interviews, which required extensive preparation and often lasted all day.  Post-residency fellowship programs are extremely competitive and the placement of residents in such fellowship programs has a material effect on standing and prestige of residency programs such as Defendant's.

24.     The combined stress on Grodman from these interviews, his injury, and his continued full obligations was significant.  The two faculty members closest to Grodman (and who had recently provided positive letters of recommendation on behalf of Grodman), Herrick and Kaylani, both acknowledged in writing that they noticed a change during this time.  Herrick wrote in an evaluation that Grodman "Seems distracted in community clinic."  Kaylani wrote also to the Committee that: "I am not sure what is going on with Zane since he came back from Dallas in September[.]"  Kaylani also characterized Grodman's behavior during this time as "senioritis."

**E.**     **Defendant Discontinues Successful Accommodations.**

25.     Despite the ongoing stressors and during this critical time, Defendant made a turning-point decision to fully discontinue the informal accommodations provided by Defendant. Upon information and belief, Defendant determined that even if Grodman was successfully placed

into a fellowship program, Grodman's disabilities, and the manifestations of those disabilities, would somehow negatively affect Defendant's standing.

26.     Thus, discontinuing these necessary informal accommodations was discriminatory and the first retaliatory action taken against Grodman on the basis of his disabilities, and because of Grodman reporting his disabilities and health concerns to Kaylani.  Defendant discontinued these accommodations knowing (and hoping) that it would negatively affect Grodman's ability to perform his obligations in the program, especially with all the additional stressors of Grodman's final year.

27.     At no time during the fall of 2021, until December 17th, did Grodman ever receive a warning, or any written notice that any disciplinary actions were even contemplated or that his status or job were in jeopardy.  Grodman was also given no notice or explanation for why these important (and successful) accommodations had been withdrawn altogether.

28.     Upon information and belief, Defendant withdrew the informal accommodations to manufacture a basis on which to terminate Grodman.  *See* Email from Raphael Mattamal dated December 5, 2021 (stating that Grodman would be a "***poison pill to any program that actually takes him*** for future [Defendant] residents.") (emphasis added).  Dr. Mattamal's communications clearly show Defendant's motivation in using Grodman's disability, and the withdrawal of these key accommodations, as a basis to terminate him.

**F.    Defendant's Pretextual Plan to Suspend Grodman Based on His Disabilities.**

29.     Upon information and belief, Grodman's termination was *predetermined*, beginning with Defendant's decision to withdraw all accommodations.  Defendant never meant to give Grodman any chance to remediate or be heard.  Defendant's discriminatory actions culminated in the following way:

- **December 5-6:**  Immediately after difficult on-call duty when Grodman was ill, Kaylani sends the Committee an "Urgent and highly confidential" email requesting an "urgent vote" to place Grodman on "immediate probation with possible path to termination." During the same email exchanges, Kaylani labels Grodman as a "dangerous resident," thus prejudicing the Committee and limiting dissent. *See* Exs. B-G (email from Kaylani and Committee's responses).  Despite the above, Grodman remained on full duty without any modifications.

- **December 10**: Kaylani met with Grodman, along with Lawson, Program administrator, and discussed Grodman's insufficient dosage of ADHD medication.  However, during this conversation, Kaylani mostly berated Grodman, accusing him of "being a physician who does not take medicine." At that time, Grodman asked if there was any possibility that he would not finish his residency on time. He was told that residency ends on June 30. Grodman took that as a sign that his career was not in jeopardy. He was not informed of the Committee's action 5 days earlier.  Again, despite the above, Grodman remained on full duty without any modifications.

- **December 17**: Grodman is first informed about disciplinary actions, Defendant skips remediation, and places Grodman on probation. *See* Ex. J (Notice of Probation).  Despite the above, Grodman remained on full duty without any modification.

- **December 17-23**: Defendant pressures Grodman into continuing his ongoing night shifts without opportunity for any kind of remediation or the opportunity to seek professional help, including help in adjusting his medications.

- **December 23**: Defendant suspends Grodman, forcing Grodman to remain isolated on campus during winter break. The suspension letter states that an investigation will take place.  No record of any investigation exists. *See* Ex. K (Notice of Suspension).[1]

- **December 27**: Grodman formally requests accommodations, including medical leave to adjust his medications.  *See* Ex. L (Formal Request for Accommodations).

---

[1] The Program's same pattern of improper conduct continued throughout its disciplinary actions against Grodman. After summarily suspending Grodman on December 23, the Program forced Grodman to remain isolated on campus and neither (1) provided Grodman with support (2) nor provided Grodman with an opportunity to seek support.  Many other these issues may have also been factors in the tragic outcome for one of the Institution's family medicine residents, Dr. Aaron Chen, who it is widely known struggled with depression and apparently died by suicide in or around October 2022 after leaving a didactics session.

- **January 4**: Ignoring Grodman's formal request for accommodations and request for leave, Defendant votes to terminate. *See* Exs. M-N (Termination Letter and Disciplinary Action Form).

30.      The evidence shows that upon receiving the program director's prejudicial request for an "urgent vote" to place Grodman on "immediate probation with possible path to termination," on December 5, 2021, Committee members immediately authorized Grodman's termination, exacerbating a hostile environment whereby all due process, fairness or consideration of any kind of remediation was destroyed.[2]

31.      The probation letter given to Grodman on December 17, 12 days after the vote instigated by Kaylani to place Grodman on "probation with a path to termination," recognized the specifics of Grodman's disabilities.  The letter major elements that needed improvement were test score improvement (without any mention of extra time that had been granted in the past and of which Kaylani had full knowledge) as well as specifically noting "attention to detail and follow up with attendings", all manifestations of Grodman's disabilities including ADHD. The letter demonstrated Kaylani's weaponization of Grodman's disabilities against him.

32.      Defendant deliberately and willfully ignored Grodman's disabilities, requests for accommodations, and had predetermined to terminate Grodman almost two weeks before ever placing Grodman under probation (and as early as December 5, 2021), all while deliberately keeping Grodman in dark about their career destroying intentions and then, continued to obfuscate and act in a disingenuous manner about the looming termination proceedings.

---

[2] Grodman's suspension and subsequent termination entirely lacked any considerations required under the ADA or by ACGME guidelines. Even though termination is the most severe and life- and career-altering sanction possible and should be considered only as a last resort, Defendant managed to terminate Grodman in less than ***three weeks*** after the date it first placed him on expedited probation.

33.     Defendant's illegal and improper refusal to consider Grodman's requests for accommodations and medical leave before terminating Grodman demonstrates a discriminatory motivation to fire Grodman. Defendant's refusal to consider accommodations (because according to Defendant, the result would have been the "same") was a result of a fundamental (and discriminatory) misunderstanding of the nature of Grodman's disabilities, especially alarming since the primary disability is essentially a common pediatric condition. This fundamental misunderstanding and underlying prejudice led Defendant to take the position that manifestations of Grodman's disabilities were ***deliberate*** and that Grodman's disabilities made Grodman inherently incapable of practicing medicine. *See, e.g.,* Kaylani's statement that "No extra time at this point, months or years would prepare [Grodman] for independent safe practice."; *see also* Dr. Mattamal's email stating "Whether this is due to a ***medical issue, psychiatric issue, or severe personality deficit,*** I don't know and honestly don't care at this stage."[3]

34.     Defendant's refusal to acknowledge Grodman's disabilities, including Defendant's belief that Grodman's disabilities were deliberate is accurately captured by its position and response to the EEOC: "Grodman was aware of the terms of his probation, and while it is unfortunate that Grodman ***chose to violate those terms*** so soon after being put on probation, the timing of Grodman's dangerous behavior reflects nothing about Defendant much less discriminatory intent."

35.     Despite Defendant's narratives to the contrary, Defendant's adverse employment actions entirely focused on the manifestations of Grodman's disabilities. In fact, Defendant's January 4, 2022 termination letter admits that Defendant's decision was based on Grodman's

---

[3] Just five months earlier, Grodman received positive evaluations from both Kaylani and Mattamal, further evidencing Grodman's unawareness of Defendant's plan to label him as a "dangerous resident" and terminate him.

conduct arising from his disabilities (and conduct for which Defendant had provided Grodman with accommodations) during his first year, and throughout his residency.

36.     Defendant knowingly lied and purposely misled Grodman regarding ongoing disciplinary actions against him.  Moreover, Defendant **falsified** the documentation relating to Grodman's ultimate termination, ***omitting the important fact that Grodman had been removed from a prior observation over 18 months prior to his probation***.  *See* Exs. H-I, M-N. At the time of his recommended termination, Defendant stated that Grodman was placed on observation, then probation and finally suspension, clearly ignoring that Grodman was taken off observation, had shown improvement and had been promoted to third year and received positive recommendations from Committee members, including the Program Director and Department Chair.

**G.     Grodman Formally Requested Reasonable Accommodations Before Termination.**

37.     Shortly after receiving the probation notice, which for the first time, made Grodman aware that his job was in jeopardy, Grodman immediately began the process of formally requesting accommodations, including medical leave, in order to adjust his medications. Grodman made several reasonable requests for accommodation, including a 30-day ***leave of absence in order to adjust his medications,*** and other standard accommodations for someone with ADHD, including extra time on exams (which is a standard request for those with ADHD); thirty days to consult with his therapists regarding counseling and treatment, an opportunity to develop a real remediation plan for any perceived performance issues, receipt and discussion of performance expectations, real-time feedback, mentoring, and time for these proposals to address the program's concerns.  *See* Ex. L (Request for Accommodations). Importantly, Grodman further sought to have his disability considered in connection with his threatened termination.

38.     After Grodman's suspension letter, upon our belief, members of the Pediatric leadership started a malicious smear campaign against Grodman, labeling him a "baby killer." Such comments were even specifically to Committee members, and even to family members of the Committee, such as Mattamal's wife, a Family Medicine attending.  In addition, following the hearing in February, Mattamal. posted on social media that he had one of the worst days of his professional life. Despite being one of Grodman's critics, he testified under questioning from Grodman, that he never gave Grodman an evaluation worse than "meets expectations" and that when he asked when he saw a change in fall of 2021 while admitting he have Grodman a positive evaluation just 6 months earlier. These rumors, in a small isolated medical community such as Amarillo, clearly had a prejudicial impact on the hearing and on other medical professionals at the hospital.

**H.     Defendant's Plan to Terminate Dr. Grodman was Discriminatory.**

39.     On December 23rd, just *six days* after being placed on probation and after working 12-hour night shifts every single night, Grodman was suspended. *See* Ex. K.  Grodman received a notice of his suspension from the program, allegedly based on his performance on the three overnight shifts.

40.     After receiving the Probation Letter,[4] Grodman promptly began the process of formally requesting accommodations, demonstrating that he was willing and able to remediate any concerns that the program has without the need for the ultimate sanction of termination.  At this time, Defendant had placed Grodman in consecutive 12-hour shifts and hoped that Grodman had

---

[4] Dr. Grodman's probation period actually built in even more time than that; he was to be on probation from December 17, 2021 until March 24, 2022, which is 97 days.  Despite this clear policy, Dr. Kaylani moved to dismiss Dr. Grodman just six days after he was informed of his probation (6% of his probationary period). There was no time or opportunity for Dr. Grodman to make use of what the probation ostensibly sought to teach him or seek external medical assistance, particularly in light of the demanding night call schedule to which he was assigned during his nascent probationary period.

no opportunity to seek assistance.  Nevertheless, Grodman formally requested accommodations and specifically requested that Defendant consider his disability in evaluating both probation and termination.

41.     Defendant's Suspension Letter alleged that Grodman's performance was "seriously compromised or may constitute a danger to patients" and stated that an investigation would take place over the next month. *See id.*  But internal Defendant emails show that such allegations had been repeated for months, and that such an investigation never occurred.  Any investigation would only have shown that Grodman's conduct did not lead to any bad outcomes whatsoever, but that the patients were all stable or not otherwise in immediate danger. After all, Defendant had purposefully scheduled these shifts at a time Defendant knew that Grodman was undermedicated, and with the intention and anticipation that Grodman would violate the terms of his probation. Indeed, Defendant's conduct was part of its unfair and expedited plan to force Grodman out of the program, even if it meant using Grodman's disabilities against him.

42.     ***First,*** Grodman had no notice of Defendant's plan to terminate him until it was too late. When he received Defendant's notice of probation, he was not aware that he had been labeled a "dangerous resident" by the Defendant Clinical Competency Committee (the "Committee") and that he would be suspended only ***six days*** later. ***Second***, Defendant's plan failed to provide Grodman with any opportunity to remediate, or even an opportunity to be heard. In addition to rushing his termination, Defendant ignored and failed to consider Grodman's formal request for accommodations, including a request for a medical leave to give Grodman the chance to adjust his medications. ***Third***, just as Defendant failed to consider Grodman's timely request for accommodations, there is no evidence that Defendant engaged in *any* decision-making process prior to terminating Grodman.

43.     Several days before the date of his termination, Grodman, by letter to the full Committee, disclosed to the full competency committee the extent of this psychiatric problems, his need to take greater than recommended doses of his medication to cope with long shifts, and formally requested reasonable accommodations that would permit him to reevaluate his medication, including leave.

44.     Defendant did not provide Grodman with the forms on which Grodman submitted that formal request for accommodations until only four days before Grodman was terminated. Defendant denied Grodman's request for reasonable accommodation, terminated him (without even considering the request) and failed to offer any alternative accommodations.

45.     Defendant never afforded Grodman the same rights as all other employees, including the right to take medical leave, etc., as Grodman had requested.  In fact, the Program violated its own internal policies in the process of terminating Grodman.  Defendant's policy states that only if the resident fails to improve based on the matters identified during probation or engages in further seriously deficient conduct, Defendant can seek to terminate the resident. Under Defendant procedures, a resident is given at least sixty days (60) after probation before termination is considered so that the resident can show improvement.  Here, Defendant terminated Grodman only _**18 days**_ after placing Grodman under Probation, completely ignoring Grodman's request for accommodations due to his disability (a fact which Defendant has admitted).

46.     Defendant's refusal to consider accommodations (because according to Defendant, the result would have been the "same") was a result of a fundamental (and discriminatory) misunderstanding of the nature of Grodman's disabilities, including the belief that Grodman's disabilities were _**deliberate**_ and the belief that that Grodman's disabilities made Grodman inherently incapable of practicing medicine. *See, e.g.,* Kaylani's statement that "No extra time at

this point, months or years would prepare [Grodman] for independent safe practice."; *see also* Mattamal email stating "Whether this is due to a ***medical issue, psychiatric issue, or severe personality deficit,*** I don't know and honestly ***don't care*** at this stage."[5]

47.     Kaylani completely dismissed Grodman's comments out of hand in the month leading to termination.  Defendant's misunderstanding of and/or ambivalence toward Grodman's disabilities is further reflected in the facts.  As program director of Defendant Kaylani endorsed policy that downplayed and ignored the physical and mental needs of physicians, even the needs of resident physicians with disabilities such as Grodman's.  In Grodman's case, Kaylani demonstrated a fundamental misunderstanding of how Grodman's disabilities were affecting his performance and argued that Grodman's disabilities were ***irrelevant*** because severe stress, sickness, or even life-events were no excuse for poor performance or non-attendance.

48.     In fact, on at least one occasion, Kaylani improperly compared Grodman's disabilities with his own personal hardship stated the following:

> "The answer is just no. Things happen. People die. People get sick. I had a very rough week this week, and I'm just going to tell you, my wife had a miscarriage last Thursday. It was hell, but her OB was so smart. I was out. I mean, as a parent or somebody involved, you can't think clearly that day […] ***And I said, I am on service***." (emphasis added).

49.     Defendant and Committee members have even admitted that they did not consider Grodman's timely request in their decision to fire him and didn't even have copies of his request during their final meeting regarding Grodman's termination.  Even weeks before suspending Grodman, the Committee expressed unwillingness to consider accommodations or to even

---

[5] Defendant's misunderstanding of Grodman's disabilities, including the belief that Grodman's disabilities were deliberate is accurately captured by its position and response to the EEOC: "Grodman was aware of the terms of his probation, and while it is unfortunate that Grodman ***chose to violate those terms*** so soon after being put on probation, the timing of Grodman's dangerous behavior reflects nothing about Defendant much less discriminatory intent."

consider that his undermedication of Grodman's disability played any role in his issues (despite setting forth specific characteristics in the probation letter to the contrary).

50. Through statements of the Committee during Grodman's appeal hearing in April 2021, Defendant has further admitted that it considered Grodman's conduct since the beginning of his residency in its decision to terminate him. ("This is a thing that has started July 2019 with all the support that is possible. Deal with it. It hurts to hear that."; "So this is not start at some probation. This does not start. This is a continuum of problems that have happened."). Defendant's reliance on Grodman's prior (resolved) observation period (which concluded positively 18 months prior to his probation), and on Grodman's conduct throughout his residency, centering on Grodman's disabilities (while ignoring Grodman's successful performance, improvement, and promotions in the interim**)**, further demonstrates Defendant's discriminatory motives. *See* Exs. H-I (Letter of Observation and Letter Regarding End of Observation).

51. On or around January 7, 2022, Grodman's employment was terminated. Defendant's termination letter admits that Defendant's decision was based on Grodman's conduct arising from his disabilities (and conduct for which Defendant had provided Grodman with accommodations) during his first year, and throughout his residency, despite the fact that Grodman was never subject to any prior disciplinary action before being placed on probation in December 2021. (Termination Letter dated January 7, 2022, recommending Grodman's termination due to alleged performance "despite repeated counseling and close mentoring" and "unprofessional conduct towards your patients and colleagues despite repeated attempts to assist you to improve your *interpersonal and communication* skills.") (emphasis added). Not surprisingly, the letter did not state that Grodman was terminated due to his complaints about discrimination or disabilities.

52.     Instead of providing any notice or of sincerely engaging in any interactive process, Defendant ignored Grodman's need and request for accommodations, and created an environment that would for Grodman to fail due to his disabilities. Because the termination process is extraordinarily severe—a professional death sentence—Defendant acted in complete disregard of Grodman's rights.

53.     Defendant knew but either ignored or disregarded that Grodman was under extraordinary stress and needed to adjust his medication, Defendant scheduled Grodman for consecutive full night shifts throughout this "probation" period. Defendant intentionally maintained Grodman on this schedule, making it impossible for Grodman to re-adjust his medication or seek related professional help, even when issues arose ***in the first and the second*** of these shifts.

54.     Moreover, during these nights, Defendant did not provide Grodman with accommodations it had provided on previous calls in earlier years, but intensified heightened aggression against Grodman, and continued to schedule Grodman for night shifts. In the end, Defendant hoped that Grodman's insufficient medication, lack of accommodations, and added pressure would lead Grodman to make some mistake that violated the terms of Grodman's probation.

55.     During the expedited Probation period, Defendant intentionally deprived Grodman of the chance to seek the professional help he needed, because Defendant had already decided to terminate Grodman for reasons that had nothing to do with Grodman's medical knowledge. Defendant was aware that, at this point, Grodman was adjusting his ADHD medications, which Kaylani expressly stated in his testimony at Grodman's internal appeal hearing, for example, Kaylani stated that "… I know that he's been adjusting his ADHD medications on his own, because

he had told me about that."  Defendant was aware that Grodman needed this help and that having only completed a handful of 24-hour calls, Grodman had not had the opportunity to adjust and optimize the dosage and timing of his ADHD medication, which remained unadjusted for extended periods.[6]

## I.    Texas Tech's Discrimination Continues Even After Grodman's Termination.

56.    In conversations with Christine Stutz, Defendant's Graduate Medical Education ("GME") Officer, in late December and/or early January, Grodman was assured he could resign at any time up to termination.  As described above, however, Defendant immediately turned around and issued Grodman's termination.  Later in January 2022, Defendant (by and through its attorneys) informed Grodman's (by and through his attorneys) that he will only be allowed to resign if Grodman did not proceed with the appeal hearing before Defendant's Appeal Review Subcommittee. After the hearing, however, that same attorney said they would attempt to have "an opportunity" to discuss Grodman's case.  Upon belief and information, however, that discussion ever happened, and Dr. Grodman's termination was upheld.  Defendant's attempt to block Grodman's right to appeal, and its unwillingness to even provide a forum to discuss the possibility of resignation constituted further attempts to ensure Grodman's termination from the program based on his disabilities.[7]

57.    In October 2022, shortly after a copy of the contemplated complaint was sent to Defendant, Grodman received a letter from the American Board of Pediatrics, notifying him they

---

[6] For example, it became clear to Dr. Grodman and his treaters while Dr. Grodman was being assessed for reasonable accommodations that his then-medication regimen was not effective beyond the first 8-10 hours, and thus an adjustment of his medication would be needed to help him perform during longer shifts.

[7] As outlined above, Grodman's experience at the Program sheds light on multiple failings of both Defendant's Institution and Program regarding how residents, and particularly residents with disabilities who seek accommodations, are treated. Interrelatedly, Grodman's difficulty with long overnight shifts in light of his disabilities highlight serious problems with the Defendant's handling of resident well-being (especially regarding fatigue and illness) despite the emphasis the ACGME began placing on those issues contemporaneously.

received notice from Defendant Texas Tech-Amarillo about his termination, upon information and belief this notice had been sent by Kaylani, informing Grodman that he will have limited time to complete a residency, otherwise the completed two and half years of his residency would be null and void.

58.     The net effect on the discrimination and recrimination against Grodman, and conferred on Grodman a professional death sentence.  As Defendant well knows, residency programs such as Defendant's do not accept applicants who were terminated.  Medical licensing boards will not accept applications for state licensing if there is any disciplinary action pending in the program.  Rejection of one state medical board, regardless of its nature, must be reported to any other medical board in seeking licensure.  At this time, due to the discrimination and recrimination, Grodman will never have the ability to practice medicine.

## V.     FIRST CAUSE OF ACTION FOR VIOLATIONS OF THE ADA

59.     Grodman repeats and re-alleges each and every allegation in the preceding paragraphs.

60.     The ADA prohibits discrimination by an employer against a qualified individual with a disability in the terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a); 29 C.F.R. § 1630.4.

61.     The ADA defines discrimination as, *inter alia*, not making reasonable accommodations to an otherwise qualified individual with a disability. 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9. The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1). Under the 2008 amendments to the ADA, an individual is "regarded as" disabled when

he is perceived as having a physical or mental impairment, regardless of whether the impairment actually exists or is perceived to limit a major life activity. *Id*. § 12102(3)(A);

62.     "[M]ajor life activities include learning, reading, concentrating, thinking, and working," as well as "the operation of a major bodily function, including ... neurological, brain, ... [and] endocrine ... functions." *Id*. § 12102(2)(A)-(B). The ADA mandates that "[t]he definition of disability be construed in favor of broad coverage of individuals to the maximum extent permitted by the terms of [the statute]." *Id*. § 12102(4)(A).

63.     Grodman has a physical or mental impairment that substantially limits one or more major life activities.

64.     Grodman's disability and its consequential limitations were known by Defendant. Once an employee requests an accommodation, the employer must engage in an interactive process with the employee to identify the precise limitation resulting from the disability and identify accommodations that overcome those limitations. 29 C.F.R. § 1630.2(0)(3). Grodman disclosed his disabilities including his ADHD and ASD to Kaylani and to the Committee.

65.     Defendant discriminated against Grodman in violation of the ADA when Defendant denied Grodman 's informal and formal requests for reasonable accommodation and subsequently failed to engage in an interactive process with Grodman (instead summarily terminating Grodman). Defendant refused to allow Grodman reasonable accommodations, the opportunity to adjust his medications, and medical leave, despite other employees having such accommodations.

66.     Defendant told Grodman he would be required to remain and take full night shifts while other similarly situated employees were not required to do so. Grodman was high-risk for depressive episodes, fatigue, and exacerbated symptoms of his disabilities. Grodman asked for, *inter alia*, the reasonable accommodation for medical leave, just as Defendant had granted other

Residents and employees in the past. Defendant said no. Instead, on January 7, 2021, Defendant terminated Grodman.

67.     The above-described unlawful employment practices caused Grodman to lose the benefits of employment and wages, and he has suffered distress, suffering, inconvenience, and other pecuniary and nonpecuniary losses. Defendant committed these acts intentionally, and with reckless indifference to the Grodman's legal rights.

## VI.     SECOND CAUSE OF ACTION FOR VIOLATIONS OF TCHRA

68.     Grodman repeats and re-alleges each and every allegation in the preceding paragraphs.

69.     Chapter 21 of the THCRA prohibits discrimination on the basis of disability. It also requires reasonable accommodations for disabilities.

70.     Defendant discriminated against Grodman in violation of the THCRA when Defendant denied Grodman's informal and formal requests for reasonable accommodation and subsequently failed to engage in an interactive process with Grodman (instead summarily terminating Grodman). Defendant refused to allow Grodman reasonable accommodations, the opportunity to adjust his medications, and medical leave, despite other employees having such accommodations.

71.     Defendant told Grodman he would be required to remain and take full night shifts while other similarly situated employees were not required to do so. Grodman was high-risk for depressive episodes, fatigue, and exacerbated symptoms of his disabilities.  Grodman asked for, *inter* alia, the reasonable accommodation for medical leave, just as Defendant had granted other Residents and employees in the past. Defendant said no. Instead, on January 7, 2021, Defendant terminated Grodman.

72.     The above-described unlawful employment practices caused Grodman to lose the benefits of employment and wages, and he has suffered distress, suffering, inconvenience, and other pecuniary and nonpecuniary losses. Defendant committed these acts intentionally, and with reckless indifference to the Grodman's legal rights.

## VII.   THIRD CAUSE OF ACTION FOR RETALIATION IN VIOLATION OF THE ADA, THE REHABILITATION ACT, AND TCHRA

73.     Grodman repeats and re-alleges each and every allegation in the preceding paragraphs.

74.     Grodman engaged in an activity protected by the ADA, the Rehabilitation Act and the TCHRA when he asked for informal and formal reasonable accommodations due to his disabilities, and for the Defendant to allow him to take medical leave to adjust his medications. Grodman engaged in an activity protected by the ADA, the Rehabilitation Act and the TCHRA when he met with Kaylani throughout his first two years and in December 2021 and communicated the lack of adequate accommodations and when he filed an online complaint with the EEOC.

75.     Grodman suffered adverse employment actions and there is a causal connection between the protected activity and the adverse action when he was summarily suspended and then fired. It is connected to his protected activity as Defendant refused to reasonably accommodate Grodman's disabilities (based on Grodman's informal and then formal request) and instead manufactured a plan to cut off accommodations and force Grodman's termination. Grodman began experiencing retaliatory actions by Defendant soon after he informally requested reasonable accommodations.  Finally, Grodman's was terminated after he submitted his formal request for reasonable accommodations.

## VIII.   REQUEST FOR JURY TRIAL

76.     Grodman requests a jury trial.

## IX.     ATTORNEY'S FEES UNDER TITLE VII

77.     Pursuant to Title VII, Grodman sues the Defendant for all reasonable attorney's fees and costs incurred in the prosecution of this suit.

## X.     PRAYER

WHEREFORE Grodman requests that the Defendant be cited to appear and answer, and that Grodman be awarded:

A.     Injunctive relief;

B.     Back pay;

C.     Expungement of Probation;

D.     Reinstatement and/or front pay as appropriate;

E.     Compensatory damages;

F.     Pre- and post-judgment interest;

G.     Costs, litigation expenses, expert witness fees, and reasonable attorney's fees; and

H.     Any further relief to which he may be justly entitled.

Date: September 7, 2023,            Respectfully Submitted,
                                    */s/ Jeffrey M. Tillotson*
                                    Jeffrey M. Tillotson
                                    State Bar No. 20039200
                                    jtillotson@tillotsonlaw.com
                                    Enrique Ramirez-Martinez
                                    State Bar No. 24122158
                                    eramirez@tillotsonlaw.com
                                    **TILLOTSON JOHNSON & PATTON**
                                    1201 Main Street, Suite 1300
                                    Dallas, Texas 75202
                                    (214) 382-3041 Telephone
                                    (214) 292-6564 Facsimile

                                    **ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Original Complaint and Jury Demand was electronically filed with the Clerk of the Court using the CM/ECF system on September 7, 2023.

                                    */s/ Jeffrey M. Tillotson*
                                    Jeffrey M. Tillotson