EXHIBIT
A

**FILED**

**January 17, 2024**

KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

| | | |
|---|---|---|
| SCHYLER Z. GRODMAN, M.D., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 5:23-cv-00210-H |
| | § | |
| TEXAS TECH UNIVERSITY HEALTH | § | |
| SCIENCES CENTER and DR. SAMER | § | |
| ZAID-KAYLANI, | § | |
| | § | |
| Defendants. | § | |

**FIRST AMENDED COMPLAINT**

Plaintiff Schyler Grodman, M.D. ("Grodman") files this Original Complaint against Texas Tech University Health Sciences Center and Dr. Samer Zaid-Kaylani (together "Defendants"), because Defendants discriminated against Grodman based on his disability, and hereby states as follows:

**I.    JURISDICTION AND VENUE**

1.    This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4), as this matter arises under the Constitution and laws of the United States.

2.    Venue is proper in the Northern District of Texas, Lubbock Division, because the causes of action alleged occurred within this District.

3.    Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  The EEOC issued a right to sue letter on June 13, 2023.  *See* Ex. A (EEOC Determination and Notice of Rights).  Plaintiff filed this suit within (90) days of receiving the Notice of Right to Sue from the EEOC.

## II.     THE PARTIES

4.      At all relevant times, Grodman was a resident of the State of Texas.  Grodman resides in the State of New Jersey.

5.      Defendant Tech University Health Sciences Center ("Texas Tech" or the "University") is a state-related university which receives federal financial assistance located at 3601 4ᵗʰ Street, Lubbock Texas 79430.

6.      Defendant Dr. Samer Zaid-Kaylani ("Kaylani") is an individual who was employed by Defendant Texas Tech University as the Director of the Pediatric Residency Program and, upon information and belief, is a Texas resident now residing in or near Dallas County.  Defendant Kaylani is sued solely in his individual capacity for certain claims for relief and for his ultra vires acts, as set forth below.

## III.     PERTINENT TEXAS TECH OPERATING POLICIES AND PROCEDURES

7.      Defendant Texas Tech University Health Sciences Center has adopted operating policies and procedures to "ensure full and equal access to individuals with disabilities to all Texas Tech University Health Sciences Center (TTUHSC or University) programs." *Health Sciences Center Operating Procedure*, § 51.04 (Nov. 27, 2019).

8.      Texas Tech's operating procedure further states that "TTUHSC is committed to the full inclusion of all qualified individuals.  As part of this commitment, persons with disabilities will not be subject to discrimination or denied full and equal access to academic programs, employment, activities, benefits, and services offered by the University on the basis of their disability.  ***This policy applies to all students, employees (faculty, staff, or student), patients, volunteers, and visitors.***" *Id.* (emphasis added).

9.     The definitions of "disability," "qualified individual," and "reasonable accommodation" under Texas Tech policy substantially mirror federal requirements under the Rehabilitation Act.

  a. **Disability** – A physical or mental impairment that substantially limits one or more major life activities, a record of such an impairment, or being regarded as having such an impairment.

  b. **Qualified Individual** – An individual who, with or without reasonable accommodation, has the requisite skills, experience, and knowledge, and can meet all essential requirements of their program or perform all essential functions of their job/position.

  c. **Reasonable Accommodation** – A modification or adjustment that:

        (1) Will enable a qualified individual to participate in a Program and does not make a fundamental alteration to Program requirements; or

        (2) Will enable an individual to participate in the application process or to perform essential job functions; or

        (3) Will allow equal access to University Programs; and

        (4) Does not create an undue hardship for the University.

10.    Under its policies, Texas Tech has the affirmative obligation to support disabled individuals. *See e.g.,* 51.04 (3)(b)(1), (2), and (5). "The University has a responsibility to identify and maintain standards that are fundamental to its Programs while still ensuring access for qualified individuals with disabilities. In meeting these obligations, the University: (1) Will *identify* and establish the abilities, skills, and knowledge necessary for initial and ongoing participation in its Programs, including employment, and evaluate individuals on that basis; (2) Will *inform individuals about the availability of accommodations* . . . (5) Will *make reasonable modifications* to the environment, policy, or practice, and/or provide reasonable auxiliary aids or services." *Id.* (emphasis added).

11.     Texas Tech policy includes provisions explicitly obligating Texas Tech to keep disabled individuals informed about their rights and about the procedures available for submitting complaints or appealing a "university decision." *See* 51.04(3)(a)(7); *see also* 51.04 (3)(b)(7) (stating that Texas Tech "***will*** inform the [disabled] individual of the availability of any appeals or complaint processes.") (emphasis added).

## IV.     VICARIOUS LIABILITY-RESPONDEAT SUPERIOR

12.     Whenever in this pleading it is alleged that Defendant or its agents or employees did any act or thing, or failed to do any act or thing, it is meant that Defendant's vice principals, officers, Clinical Competency Committee ("Committee") members, servants, employees, agents, or representatives did any act or thing, or failed to do such act or thing, or that such act or thing or omission was done in the course and scope of that person's employment at Defendant, and/or in the furtherance of Defendant's interests, or with the full authorization, permission, tolerance, and/or ratification of Defendant, was done in the normal routine of the accepted, tolerated, or permitted conduct, customs, and/or practices of Defendant's officers, owners, servants, employees, and/or representatives.

13.     Defendant's discriminatory actions against Grodman in the relevant period were principally brought about by and through Dr. Samer Zaid-Kaylani ("Kaylani"), the former director of Defendant's Pediatrics Residency Program, and various members of Defendant's faculty and Committee including: Dr. Anders Leverton, Dr. Smita Bhaskaran, Dr. Shannon Dr. Herrick, Dr. Stacy Steans, Dr. Srilatha Alapati, Dr. Olubunkunola Adesanya, Dr. Muhammad Subhani, Dr. Enas Shanshen, Dr. Johnnie Faircloth, Dr. Jenda Arawiran, Dr. Alison Lunsford, and Dr. Mandy Griffin.

## V.      FACTS

### A.      Grodman's Disabilities and Symptoms.

14.     Grodman is disabled and has been diagnosed with the following conditions: attention deficit hyperactivity disorder ("ADHD"), Autism Spectrum Disorder ("ASD"), depression, and social anxiety.  Grodman was clinically diagnosed with ADHD when he was three years old and has taken ADHD medication for his condition since he was five.  At the time of Grodman's dismissal by Defendant, he was at the near maximal 24 hour recommended dosage of his medication.

15.     Grodman's disability includes the combination of the effects of Grodman's ADHD, along with his ASD, anxiety, and depression diagnosis—all of which impact Grodman's major life activities separately and by exacerbating Grodman's symptoms related to his ADHD.

16.     Grodman's ADHD substantially limits one or more of Grodman's major life activities, including his learning, memory, sleep, and productivity.  In its active state, and in the absence of mitigating measures like sufficient medication, Grodman's ADHD condition significantly limits Grodman's major life activities.  It severely restricts Grodman's concentration and memory.  Grodman's ADHD medication also impacts and affects his major life activities including work and his personal life.  Grodman's common ADHD symptoms include depression, anxiety, social withdrawal, impaired concentration, memory problems, fatigue, and physical and emotional reactions, including increased negative symptoms as the medication's effect wears or when the dosage is insufficient (causing Grodman to have to adjust dosages from time to time). In addition, the medication has side effects that substantially limit his sleeping and wakefulness.

17.     As a consequence of his disabilities, Grodman sometimes requires accommodations in the form of extended time to complete particular tasks.  And based on the facts above, at all relevant times, Grodman was a person with an "actual" disability, a "record of" disability, and a

"regarded-as" disability, as defined by federal statutes, including Section 504 of the Rehabilitation Act, the ADA as amended, and by Chapter 21, as amended.[1]

18.    In spite of these diagnoses, and with reasonable accommodations, Grodman completed his undergraduate at the University of Pennsylvania, a Pre-Med Post-Baccalaureate Program at Columbia University, and medical school at the College of Physicians and Surgeons at Columbia University, where he also received a masters degree. He also obtained accommodations from the USMLE/NBME for the Step examinations and graduate school admissions testing.

**B.    Relevant Employment and Time Period.**

19.    Defendant operates a Pediatric Residency Program (hereinafter the "Program"), the mission and purpose of which is education. Residents of the Program are employed by Defendant. Grodman was hired by Defendant to work in the Program as a Resident in 2019.  Defendant terminated Grodman's employment on or around January 7, 2022.  The acts of discrimination and retaliation at the basis of this complaint occurred from the time of Grodman's hiring by Defendant to the date that Grodman's termination was reviewed and wrongfully upheld by Defendant's Appeal Review Subcommittee, on or around April 2022.  During all relevant times, Kaylani remained the Program Director.

20.    As a Resident of the Program, Grodman's duties (at the time the discrimination occurred) included being responsible for coordinating the care of multiple pediatric patients on the team Grodman was assigned to.  Grodman also performed the initial assessments of the patients and actively participated in all aspects of pediatric patient treatment and care, including history

---

[1] Section 504 of the Rehabilitation Act, codified as 29 U.S.C. § 794, notes that the standards used to determine whether discrimination has taken place shall be the standards applied under Title I of the Americans with Disabilities Act. 29 U.S.C. § 794(d).

and physical, diagnostic and therapeutic planning, procedures, writing orders, interactions with family, and maintaining medical records.

## C.     Defendant's Awareness of Grodman's Disability.

21.     During the first two years, Kaylani also worked extensively with Grodman as the program director.  Kaylani asked questions about Grodman's health conditions and disabilities. At one point, Kaylani even confessed that Grodman shared attributes with his daughter, describing them as both bright but with "social issues."  Grodman was uncomfortable sharing details of his disabilities but disclosed his diagnosed disabilities, including his ADHD diagnosis, his struggle to adjust his medications, and the nature of the impact that his disabilities had on his personal life and work.

22.     Since the beginning of his work, Grodman also disclosed that he received accommodations including extra time on all standardized testing and all USMLE exams, to which Kaylani expressed no knowledge.  Grodman also disclosed his disability to his designated mentor, Dr. Sharon Herrick ("Herrick") who was and remains the Chair of the Pediatrics Department at Texas Tech-Amarillo as well to Dr. Angelo Wong ("Wong"), a development Pediatrician during his rotation through her service in his first year of residency.

23.     Upon information and belief, Kaylani also informed all program leadership about Grodman's disabilities, or all program leadership became aware of Grodman's disabilities independently.  Thus, Defendant no doubt had knowledge of Grodman's disabilities, or otherwise recognized his behaviors as symptomatic of his disabilities. *See, e.g.,* February 7, 2021, email from Dr. Shanshen (a member of the leadership committee of Defendant) observing that "I think there are some ***behavioral/psychiatric issues*** as well that might be affecting [Grodman's] performance." (emphasis added).

24.     Defendant was aware of Grodman's disabilities and the impact those disabilities had on Grodman's ability to perform his obligations.  During Grodman's first two years of his residency, and after Grodman disclosed the nature of his disabilities to Defendant, Grodman received several informal accommodations from Defendant.  Kaylani also knew that Grodman had been given extra time on exams throughout medical school and on all licensing examinations. With this knowledge, Defendant, by and through Kaylani, represented to Grodman that no such accommodations were necessary, and that the results of the internal examinations were for educational purposes only and that those scores "would never be used against [Grodman]." Finally, Defendant also knew that Grodman was already on ADHD medication and that, given the duration of action of the medications, long stretches of scheduled work needed to be carefully monitored.

25.     Given Defendant's knowledge of Grodman's disabilities, and especially during Grodman's second year, Defendant provided informal accommodations tailored to Grodman's disabilities and requests, including but not limited to:

- additional regular meetings with Grodman's mentor;

- supervised calls and close monitoring, including additional review of all orders;

- built-in, additional, detailed feedback from faculty and supervisors, (which Grodman continually requested);

- major scheduling adjustments, including accommodated rotation scheduling;

- planned, additional Committee meetings to discuss Grodman's progress; and

- supplemental meetings, phone calls, and talks to discuss call preparation.

26.     With the help of these tailored accommodations, and through his own determination, Grodman's work performance during his first two years of residency was

satisfactory (Grodman was promoted twice).  And given these prior experiences, Dr. Grodman reasonably expected the Program to be responsive and collaborative regarding accommodations.

27.     At the end of his second year, Grodman was fully supported for competitive fellowship applications.  In fact, after Grodman's successful promotion to the third and final year of his residency, both Kaylani, the Department Director, and Dr. Herrick, the Department Chair, wrote positive letters of recommendation supporting Grodman's candidacy for a post-graduation pediatric fellowship.

**D.     Grodman's Final Year of Residency.**

28.     On August 28, 2021, during Grodman's final year of residency, Grodman tore his Achilles tendon during a soccer game organized by Kaylani.  Despite the injury, Grodman fulfilled full duties as a resident, using a walking boot, until surgery, after which he requested and was given time off.  Afterward, Grodman was limited to utilizing a scooter to always get around until early October when he was permitted to use crutches.  At that time, he needed to undergo physical therapy until around Thanksgiving without any diminution of responsibilities.

29.     In addition, from September 8, 2021, to October 14, 2021, Grodman had almost a dozen post-residency fellowship interviews, which required extensive preparation and often lasted all day.  Post-residency fellowship programs are extremely competitive and the placement of residents in such fellowship programs has a material effect on standing and prestige of residency programs such as Defendant's.

30.     The combined stress on Grodman from these interviews, his injury, and his continued full obligations was significant.  The two faculty members closest to Grodman (and who had recently provided positive letters of recommendation on behalf of Grodman), Herrick and Kaylani, both acknowledged in writing that they noticed a change during this time.  Herrick wrote

in an evaluation that Grodman "Seems distracted in community clinic."  Kaylani wrote also to the Committee that: "I am not sure what is going on with Zane since he came back from Dallas in September[.]"  Kaylani also characterized Grodman's behavior during this time as "senioritis."

**E.  Defendant Discontinues Successful Accommodations.**

31.    Despite the ongoing stressors and during this critical time, Defendant made a turning-point decision to fully discontinue the informal accommodations provided by Defendant. Upon information and belief, Defendant determined that even if Grodman was successfully placed into a fellowship program, Grodman's disabilities, and the manifestations of those disabilities, would somehow negatively affect Defendant's standing.

32.    Defendant discontinued these accommodations knowing (and hoping) that it would negatively affect Grodman's ability to perform his obligations in the program, especially with all the additional stressors of Grodman's final year.  Thus, discontinuing these necessary informal accommodations was discriminatory and the first retaliatory action taken against Grodman on the basis of his disabilities, and because of Grodman reporting his disabilities and health concerns to Kaylani.

33.    At no time during the fall of 2021, until December 17th, did Grodman ever receive a warning, or any written notice that any disciplinary actions were even contemplated or that his status or job were in jeopardy.  Grodman was also given no notice or explanation for why these important (and successful) accommodations had been withdrawn altogether.

34.    Upon information and belief, Defendant withdrew the informal accommodations to manufacture a basis on which to terminate Grodman.  *See* Email from Raphael Mattamal dated December 5, 2021 (stating that Grodman would be a "***poison pill to any program that actually takes him*** for future [Defendant] residents.") (emphasis added).  Dr. Mattamal's communications

clearly show Defendant's motivation in using Grodman's disability, and the withdrawal of these key accommodations, as a basis to terminate him.

**F.      Defendant's Pretextual Plan to Suspend Grodman Based on His Disabilities.**

35.      Upon information and belief, Grodman's termination was *predetermined*, without any notice of hearing to Grodman, beginning with Defendant's decision to withdraw all accommodations.  Instead, the program director repeatedly assured Grodman that everything was fine.  Defendant never meant to give Grodman any notice that his residency was in jeopardy, chance to remediate, or chance be heard.  Defendant's discriminatory actions culminated in the following way:

- **December 5-6:**  Immediately after difficult on-call duty when Grodman was ill, Kaylani sends the Committee an "Urgent and highly confidential" email requesting an "urgent vote" to place Grodman on "immediate probation with possible path to termination." During the same email exchanges, Kaylani labels Grodman as a "dangerous resident," thus prejudicing the Committee and limiting dissent. *See* Exs. B-G (email from Kaylani and Committee's responses).  Despite the above, Grodman remained on full duty without any modifications.

- **December 10**: Kaylani met with Grodman, along with Lawson, Program administrator, and discussed Grodman's insufficient dosage of ADHD medication.  However, during this conversation, Kaylani mostly berated Grodman, accusing him of "being a physician who does not take medicine." At that time, Grodman explicitly asked if there was any possibility that he would not finish his residency on time. He was told that residency ends on June 30.  Grodman took that as a sign that his career was not in jeopardy. He was not informed of the Committee's action 5 days earlier.  Again, despite the above, Grodman remained on full duty without any modifications.

- **December 17**: Grodman is first informed about disciplinary actions, Defendant skips remediation, and places Grodman on probation. *See* Ex. J (Notice of Probation).  Despite the above, Grodman remained on full duty without any modification. Grodman was not given any details regarding the specific reasoning or terms behind his probation.

- **December 17-23**: Defendant pressures Grodman into continuing his ongoing night shifts without opportunity for any kind of remediation or the

opportunity to seek professional help, including help in adjusting his medications.

- **December 23**: Defendant suspends Grodman, again without notice as to the cause, forcing Grodman to remain isolated on campus during winter break. The suspension letter states that an investigation will take place. No record of any investigation exists. *See* Ex. K (Notice of Suspension).[2]

- **December 27**: Grodman formally requests accommodations, including medical leave to adjust his medications. *See* Ex. L (Formal Request for Accommodations).

- **January 4**: Ignoring Grodman's formal request for accommodations and request for leave, Defendant votes to terminate. *See* Exs. M-N (Termination Letter and Disciplinary Action Form). Grodman was never given a full description of the grounds for his termination or any chance to advocate for himself.

36.     The evidence shows that, upon receiving the program director's prejudicial request for an "urgent vote" to place Grodman on "immediate probation with possible path to termination," on December 5, 2021, Committee members immediately, without any notice or communication with Grodman, authorized Grodman's termination, exacerbating a hostile environment whereby all due process, fairness or consideration of any kind of remediation was destroyed.[3]

37.     The probation letter given to Grodman on December 17, 12 days ***after the vote*** instigated by Kaylani to place Grodman on "probation with a path to termination," recognized the

---

[2] The Program's same pattern of improper conduct continued throughout its disciplinary actions against Grodman. After summarily suspending Grodman on December 23, the Program forced Grodman to remain isolated on campus and neither (1) provided Grodman with support (2) nor provided Grodman with an opportunity to seek support. Many other these issues may have also been factors in the tragic outcome for one of the Institution's family medicine residents, Dr. Aaron Chen, who it is widely known struggled with depression and apparently died by suicide in or around October 2022 after leaving a didactics session.

[3] Grodman's suspension and subsequent termination entirely lacked any considerations required under the ADA or by ACGME guidelines. Even though termination is the most severe and life- and career-altering sanction possible and should be considered only as a last resort, Defendant managed to terminate Grodman in less than ***three weeks*** after the date it first placed him on expedited probation.

specifics of Grodman's disabilities.  The letter stated the major elements that Grodman needed to improve were test scores (without any mention of extra time that had been granted in the past and of which Kaylani had full knowledge) as well as, vaguely, "attention to detail and follow up with attendings", all manifestations of Grodman's disabilities including ADHD. The letter demonstrated Kaylani's weaponization of Grodman's disabilities against him.

38.     Defendant deliberately and willfully ignored Grodman's disabilities, requests for accommodations, and had predetermined to terminate Grodman almost two weeks before ever placing Grodman under probation (and as early as December 5, 2021), all while deliberately keeping Grodman in dark about their career destroying intentions and, then, continued to obfuscate and act in a disingenuous manner about the looming termination proceedings.

39.     Defendant's illegal and improper refusal to consider Grodman's requests for accommodations and medical leave before terminating Grodman demonstrates a discriminatory motivation to fire Grodman. Defendant's refusal to consider accommodations (because according to Defendant, the result would have been the "same") was a result of a fundamental (and discriminatory) misunderstanding of the nature of Grodman's disabilities, especially alarming since the primary disability is a common pediatric condition. This fundamental misunderstanding and underlying prejudice led Defendant to take the position that manifestations of Grodman's disabilities were ***_deliberate_*** and that Grodman's disabilities made Grodman inherently incapable of practicing medicine. *See, e.g.,* Kaylani's statement that "No extra time at this point, months or years would prepare [Grodman] for independent safe practice."; *see also* Dr. Mattamal's email

stating "Whether this is due to a ***medical issue, psychiatric issue, or severe personality deficit,*** I don't know and honestly don't care at this stage."[4]

40.     Defendant's refusal to acknowledge Grodman's disabilities, including Defendant's belief that Grodman's disabilities were deliberate is accurately captured by its position and response to the EEOC: "Grodman was aware of the terms of his probation, and while it is unfortunate that Grodman ***chose to violate those terms*** so soon after being put on probation, the timing of Grodman's dangerous behavior reflects nothing about Defendant much less discriminatory intent."

41.     Despite Defendant's narratives to the contrary, Defendant's adverse employment actions entirely focused on the manifestations of Grodman's disabilities. In fact, Defendant's January 4, 2022, termination letter admits that Defendant's decision was based on Grodman's conduct arising from his disabilities (and conduct for which Defendant had provided Grodman with accommodations) during his first year, and throughout his residency.

42.     Defendant knowingly lied and purposely misled Grodman regarding ongoing disciplinary actions against him.  Moreover, Defendant **falsified** the documentation relating to Grodman's ultimate termination, ***omitting the important fact that Grodman had been removed from a prior observation over 18 months prior to his probation***.  *See* Exs. H-I, M-N. At the time of his recommended termination, Defendant stated that Grodman was placed on observation, then probation and finally suspension, clearly ignoring that Grodman was taken off observation, had shown improvement, and had been promoted to third year and received positive recommendations from Committee members, including the Program Director and Department Chair.

---

[4] Just five months earlier, Grodman received positive evaluations from both Kaylani and Mattamal, further evidencing Grodman's unawareness of Defendant's plan to label him as a "dangerous resident" and terminate him.

**G.      Grodman Formally Requested Reasonable Accommodations Before Termination.**

43.      Shortly after receiving the probation notice, which for the first time, made Grodman aware that his job was in jeopardy, Grodman immediately began the process of formally requesting accommodations, including medical leave, in order to adjust his medications. Grodman made several reasonable requests for accommodation, including a 30-day ***leave of absence in order to adjust his medications,*** and other standard accommodations for someone with ADHD, including extra time on exams (which is a standard request for those with ADHD); thirty days to consult with his therapists regarding counseling and treatment, an opportunity to develop a real remediation plan for any perceived performance issues, receipt and discussion of performance expectations, real-time feedback, mentoring, and time for these proposals to address the program's concerns. *See* Ex. L (Request for Accommodations). Importantly, Grodman further sought to have his disability considered in connection with his threatened termination.[5]

**H.      Defendant's Plan to Terminate Dr. Grodman was Discriminatory.**

44.      On December 23rd, just ***six days*** after being placed on probation and after working 12-hour night shifts every single night, Grodman was suspended. *See* Ex. K.  Grodman received a notice of his suspension from the program, allegedly based on his performance on the three overnight shifts.

---

[5] After Grodman's suspension letter, upon our belief, members of the Pediatric leadership started a malicious smear campaign against Grodman, labeling him a "baby killer."  Such comments were even specifically to Committee members, and even to family members of the Committee, such as Mattamal's wife, a Family Medicine attending.  In addition, following the hearing in February, Mattamal. posted on social media that he had one of the worst days of his professional life. Despite being one of Grodman's critics, he testified under questioning from Grodman, that he never gave Grodman an evaluation worse than "meets expectations" and that when he asked when he saw a change in fall of 2021 while admitting he have Grodman a positive evaluation just six months earlier. These rumors, in a small isolated medical community such as Amarillo, clearly had a prejudicial impact on the hearing and on other medical professionals at the hospital.

45.     After receiving the Probation Letter,[6] Grodman promptly began the process of formally requesting accommodations, demonstrating that he was willing and able to remediate any concerns that the program has without the need for the ultimate sanction of termination.  At this time, Defendant had placed Grodman in consecutive twelve-hour shifts and hoped that Grodman had no opportunity to seek assistance.    Nevertheless, Grodman formally requested accommodations and specifically requested that Defendant consider his disability in evaluating both probation and termination.

46.     Defendant's Suspension Letter alleged that Grodman's performance was "seriously compromised or may constitute a danger to patients" and stated that an investigation would take place over the next month.  *See id.*  But internal Defendant emails show that such allegations had been repeated for months, and that such an investigation never occurred.  Any investigation would only have shown that Grodman's conduct did not lead to any bad outcomes whatsoever, but that the patients were all stable or not otherwise in immediate danger. After all, Defendant had purposefully scheduled these shifts at a time Defendant knew that Grodman was undermedicated, and with the intention and anticipation that Grodman would violate the terms of his probation. Indeed, Defendant's conduct was part of its unfair and expedited plan to force Grodman out of the program, even if it meant using Grodman's disabilities against him.

47.     ***First,*** Grodman had no notice of Defendant's plan to terminate him until his termination was already decided. When he received Defendant's notice of probation, he was not

---

[6] Grodman's probation period actually built in even more time than that; he was to be on probation from December 17, 2021 until March 24, 2022, which is 97 days.  Despite this clear policy, Kaylani moved to dismiss Grodman just six days after he was informed of his probation (6% of his probationary period). There was no time or opportunity for Grodman to make use of what the probation ostensibly sought to teach him or seek external medical assistance, particularly in light of the demanding night call schedule to which he was assigned during his nascent probationary period.

aware that the Committee had already voted to terminate Grodman, that Grodman had been labeled a "dangerous resident" by the Defendant Clinical Competency Committee (the "Committee") and that Grodman would be suspended only *six days* later. ***Second***, Defendant's plan failed to provide Grodman with any notice as to the imminent destruction of his medical residency, any opportunity to remediate, or even an opportunity to be heard. In addition to rushing his termination, Defendant ignored and failed to consider Grodman's formal request for accommodations, including a request for a medical leave to give Grodman the chance to adjust his medications. ***Third***, just as Defendant failed to consider Grodman's timely request for accommodations, there is no evidence that Defendant engaged in *any* decision-making process prior to terminating Grodman.

48.     Several days before the date of his termination, Grodman, by letter to the full Committee, disclosed to the full competency committee the extent of his psychiatric problems, his need to take greater than recommended doses of his medication to cope with long shifts, and formally requested reasonable accommodations that would permit him to reevaluate his medication, including leave.

49.     Defendant did not provide Grodman with the forms on which Grodman submitted that formal request for accommodations until only four days before Grodman was terminated. Defendant denied Grodman's request for reasonable accommodation, terminated him (without even considering the request) and failed to offer any alternative accommodations.

50.     Defendant never afforded Grodman the same rights as all other employees, including the right to take medical leave, etc., as Grodman had requested.  In fact, the Program violated its own internal policies in the process of terminating Grodman.  Defendant's policy states that only if the resident fails to improve based on the matters identified during probation or engages in further seriously deficient conduct, Defendant can seek to terminate the resident.  Under

Defendant procedures, a resident is required to be given at least sixty days (60) after probation before termination is considered so that the resident can show improvement.  Here, Defendant terminated Grodman only ***18 days*** after placing Grodman under Probation, completely ignoring Grodman's request for accommodations due to his disability (a fact which Defendant has admitted).

51.     Defendant's refusal to consider accommodations (because according to Defendant, the result would have been the "same") was a result of a fundamental (and discriminatory) misunderstanding of the nature of Grodman's disabilities, including the belief that Grodman's disabilities were ***deliberate*** and the belief that Grodman's disabilities made Grodman inherently incapable of practicing medicine. *See, e.g.,* Kaylani's statement that "No extra time at this point, months or years would prepare [Grodman] for independent safe practice."; *see also* Mattamal email stating "Whether this is due to a ***medical issue, psychiatric issue, or severe personality deficit,*** I don't know and honestly ***don't care*** at this stage."[7]  Throughout Grodman's improper and expedited termination based on disciplinary measures, Texas Tech and Kaylani abandoned internal policy and professional judgment.

52.     Kaylani completely dismissed Grodman's comments out of hand in the month leading to termination.  Defendant's misunderstanding of and/or ambivalence toward Grodman's disabilities is further reflected in the facts.  As program director of Defendant Kaylani endorsed policy that downplayed and ignored the physical and mental needs of physicians, even the needs of resident physicians with disabilities such as Grodman's. In Grodman's case, Kaylani

---

[7] Defendant's misunderstanding of Grodman's disabilities, including the belief that Grodman's disabilities were deliberate is accurately captured by its position and response to the EEOC: "Grodman was aware of the terms of his probation, and while it is unfortunate that Grodman ***chose to violate those terms*** so soon after being put on probation, the timing of Grodman's dangerous behavior reflects nothing about Defendant much less discriminatory intent."

demonstrated a fundamental misunderstanding of how Grodman's disabilities were affecting his performance and argued that Grodman's disabilities were ***irrelevant*** because severe stress, sickness, or even life-events were no excuse for poor performance or non-attendance.

53.     In fact, on at least one occasion, Kaylani improperly compared Grodman's disabilities with his own personal hardship stated the following:

> "The answer is just no. Things happen. People die. People get sick. I had a very rough week this week, and I'm just going to tell you, my wife had a miscarriage last Thursday. It was hell, but her OB was so smart. I was out. I mean, as a parent or somebody involved, you can't think clearly that day […] ***And I said, I am on service***." (emphasis added).

54.     Defendant and Committee members have even admitted that they did not consider Grodman's timely request in their decision to fire him and didn't even have copies of his request during their final meeting regarding Grodman's termination.   Even weeks before suspending Grodman, the Committee expressed unwillingness to consider accommodations or to even consider that his undermedication of Grodman's disability played any role in his issues (despite setting forth specific characteristics in the probation letter to the contrary).

55.     Through statements of the Committee during Grodman's appeal hearing in February 2021,[8] Defendant further admitted that it considered Grodman's conduct since the beginning of his residency in its decision to terminate him. ("This is a thing that has started July 2019 with all the support that is possible. Deal with it. It hurts to hear that."; "So this is not start at some probation. This does not start. This is a continuum of problems that have happened."). These

---

[8]  Despite the appeal hearing, no defects in the improper termination process were cured.  For example, the hearing panel did not consider or weigh Grodman's formal request for accommodations, and completely ignored the serious procedural defects of Grodman's termination and disciplinary measures.  Instead, the hearing was only an extension and further deprivation of Grodman's rights, and used to further mislead Grodman into thinking that Texas Tech was extending an opportunity for Grodman to be able to resign.  But such an opportunity was not granted.  Moreover, the hearing was expressly not *de novo* and granted complete weight and deference to the earlier improper decision to terminate Grodman.

reasons were different than the reasons presented to Grodman for his probation and suspension before termination. Defendant's reliance on Grodman's prior (resolved) observation period (which concluded positively 18 months prior to his probation), and on Grodman's conduct throughout his residency, centering on Grodman's disabilities (while ignoring Grodman's successful performance, improvement, and promotions in the interim**)**, further demonstrates Defendant's discriminatory motives. *See* Exs. H-I (Letter of Observation and Letter Regarding End of Observation).

56. On or around January 7, 2022, Grodman's employment was terminated. Defendant's termination letter admits that Defendant's decision was based on Grodman's conduct arising from his disabilities (and conduct for which Defendant had provided Grodman with accommodations) during his first year, and throughout his residency, despite the fact that Grodman was never subject to any prior disciplinary action before being placed on probation in December 2021. (Termination Letter dated January 7, 2022, recommending Grodman's termination due to alleged performance "despite repeated counseling and close mentoring" and "unprofessional conduct towards your patients and colleagues despite repeated attempts to assist you to improve your ***interpersonal and communication*** skills.") (emphasis added). Not surprisingly, the letter did not state that Grodman was terminated due to his complaints about discrimination or disabilities.

57. Instead of providing any notice or of sincerely engaging in any interactive process, Defendant ignored Grodman's need and request for accommodations, and created an environment that would force Grodman to fail due to his disabilities. Because the termination process is extraordinarily severe—a professional death sentence—Defendant acted in complete disregard of Grodman's rights.

58.     Defendant knew but either ignored or disregarded that Grodman was under extraordinary stress and needed to adjust his medication, yet Defendant scheduled Grodman for consecutive full night shifts throughout this "probation" period. Defendant intentionally maintained Grodman on this schedule, making it impossible for Grodman to re-adjust his medication or seek related professional help, even when issues arose ***in the first and the second*** of these shifts.

59.     Moreover, during these nights, Defendant did not provide Grodman with accommodations it had provided on previous calls in earlier years but, instead, intensified aggression against Grodman and continued to schedule Grodman for night shifts. In the end, Defendant hoped that Grodman's insufficient medication, lack of accommodations, and added pressure would lead Grodman to make some mistake that violated the terms of Grodman's probation.

60.     During the expedited, pretextual Probation period, Defendant intentionally deprived Grodman of the chance to seek the professional help he needed, because Defendant had already decided to terminate Grodman for reasons that had nothing to do with Grodman's medical knowledge.  Defendant was aware that, at this point, Grodman was adjusting his ADHD medications, which Kaylani expressly stated in his testimony at Grodman's internal appeal hearing, for example, Kaylani stated that "I know that he's been adjusting his ADHD medications on his own, because he had told me about that."  Defendant was aware that Grodman needed this help and that having only completed a handful of 24-hour calls, Grodman had not had the

opportunity to adjust and optimize the dosage and timing of his ADHD medication, which remained unadjusted for extended periods.[9]

## I.   Texas Tech's Discrimination Continues Even After Grodman's Termination.

61.   In conversations with Christine Stutz, Defendant's Graduate Medical Education ("GME") Officer, in late December and/or early January, Grodman was assured he could resign at any time up to termination.  As described above, however, Defendant immediately turned around and issued Grodman's termination.   Later in January 2022, Defendant (by and through its attorneys) informed Grodman's (by and through his attorneys) that he will only be allowed to resign if Grodman did not proceed with the appeal hearing before Defendant's Appeal Review Subcommittee. After the hearing, however, that same attorney said they would attempt to have "an opportunity" to discuss Grodman's case.  Upon belief and information, however, that discussion never happened, and Dr. Grodman's termination was upheld.   Defendant's attempt to block Grodman's right to appeal, and its unwillingness to even provide a forum to discuss the possibility of resignation constituted further attempts to ensure Grodman's termination from the program based on his disabilities.[10]

---

[9] For example, it became clear to Dr. Grodman and his treaters while Dr. Grodman was being assessed for reasonable accommodations that his then-medication regimen was not effective beyond the first 8-10 hours, and, thus, an adjustment of his medication would be needed to help him perform during longer shifts.

[10] As outlined above, Grodman's experience at the Program sheds light on multiple failings of both Defendant's Institution and Program regarding how residents, and particularly residents with disabilities who seek accommodations, are treated. Interrelatedly, Grodman's difficulty with long overnight shifts in light of his disabilities highlight serious problems with the Defendant's handling of resident well-being (especially regarding fatigue and illness), despite the emphasis the ACGME began placing on those issues contemporaneously.

62.     In October 2022, shortly after a copy of the contemplated complaint was sent to Defendant, Grodman received a letter from the American Board of Pediatrics, notifying him they received notice from Defendant Texas Tech-Amarillo about his termination. Upon information and belief, this notice had been sent by Kaylani, informing Grodman that he will have limited time to complete a residency, otherwise the completed two and half years of his residency would be null and void.

63.     The net effect on the discrimination and recrimination against Grodman was that Grodman received a professional death sentence.  As Defendant well knows, residency programs such as Defendant's do not accept applicants who were terminated.  Medical licensing boards will not accept applications for state licensing if there is any disciplinary action pending in the program. Rejection of one state medical board, regardless of its nature, must be reported to any other medical board in seeking licensure.  At this time, due to the discrimination and recrimination of Defendant, Grodman will never have the ability to practice medicine.

## VI.     FIRST CAUSE OF ACTION FOR DISCRIMINATION AND RETALIATION IN VIOLATION OF THE REHABILITATION ACT
### (Against Texas Tech)

64.     Grodman repeats and re-alleges each and every allegation in the preceding paragraphs.

65.     Section 504 of the Rehabilitation Act prohibits disability discrimination by recipients of federal grants, contracts, and other federal financial assistance. Defendants, including their respective departments, agencies, and other instrumentalities, are recipients of federal funds. 45 C.F.R. § 84.3(f).

66.     The Rehabilitation Act provides, in relevant part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability,

be excluded from participation in, be denied benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794.

67.    Discrimination under the rehabilitation act includes traditional discrimination, failing to accommodate known disabilities and retaliation against disabled individuals for engaging in protected activities. *See Aguillard v. Mukasey*, 295 F. App'x 619, 622 (5th Cir. 2008) (outlining discrimination under Rehabilitation Act); Calderon *v. Potter*, 113 Fed. Appx. 586, 592 (5th Cir. 2004) (outlining retaliation); *Doe v. Texas A&M Univ.*, 634 F. Supp. 3d 365, 379–80 (S.D. Tex. Oct. 6, 2022) (outlining failure to accommodate).

68.    The Rehabilitation Act has been implemented by regulations, providing, *inter alia*, that recipients of federally funded programs and activities shall not, "on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program, services or activity which receives Federal financial assistances." 45 C.F.R. § 84.4 (a).

69.    Prohibited discrimination includes but is not limited to:

- denying a qualified person with a disability an opportunity to participate in or benefit from an aid, benefit, or service 45 C.F.R. § 84.4 (b)(1)(i).

- affording a qualified person with a disability an opportunity to participate in or benefit from the aid, benefit or services that is not equal to that afforded others. 45 C.F.R. § 84.4 (b)(1)(ii).

- providing a qualified person with a disability with an aid, benefit, or service that is not as effective as that provided to others. 45 C.F.R. § 84.4 (b)(1)(iii).

- perpetuating discrimination or otherwise limiting a qualified disabled person in the enjoyment of any privilege, advantage or opportunity enjoyed by others receiving an aid, benefit, or service. 45 C.F.R. § 84.4 (b)(1)(v)(vii).

- utilizing criteria or methods of administration that subject qualified persons with disabilities to discrimination on the basis of disability, or

have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of recipient's program or activity with respect to persons with disabilities. 45 C.F.R. Part 84; (b)(4).

70.     Defendant's actions constitute a failure to accommodate, retaliation, discrimination, and constitute ongoing and continuous violation of the Rehabilitation Act and its supporting regulations and continue to inflict irreparable harm on Grodman.

71.     Grodman has a physical or mental impairment that substantially limits one or more major life activities.  Grodman's disability and its consequential limitations were known by Defendant Texas Tech.

72.     Defendant refused to allow Grodman reasonable accommodations, the opportunity to adjust his medications, and medical leave, despite other employees having such accommodations.

73.     Defendant told Grodman he would be required to remain and take full night shifts while other similarly situated employees were not required to do so. Grodman was high-risk for depressive episodes, fatigue, and exacerbated symptoms of his disabilities. Grodman asked for, *inter alia*, the reasonable accommodation for medical leave, just as Defendant had granted other Residents and employees in the past. Defendant said no. Instead, on January 7, 2021, Defendant terminated Grodman.

74.     The above-described unlawful employment practices, which violated the Rehabilitation Act, caused Grodman to lose the opportunity to become a licensed physician, and other non-pecuniary benefits.  Defendant Texas Tech committed these acts intentionally, and with reckless indifference to Grodman's legal rights under the Rehabilitation Act.

75.     Moreover, Grodman engaged in an activity protected by the Rehabilitation Act when he asked for informal and formal reasonable accommodations due to his disabilities and for the Defendant to allow him to take medical leave to adjust his medications. Grodman further

25

engaged in an activity protected by the Rehabilitation Act when he met with Kaylani throughout his first two years and in December 2021 and communicated the lack of adequate accommodations and when he filed an online complaint with the EEOC.

76.     Grodman suffered adverse employment actions and there is a causal connection between the protected activity and the adverse action when he was summarily suspended and then fired. It is connected to his protected activity as Defendant refused to reasonably accommodate Grodman's disabilities (based on Grodman's informal and then formal request) and instead manufactured a plan to cut off accommodations and force Grodman's termination.

77.     Grodman began experiencing retaliatory actions by Defendant soon after he informally requested reasonable accommodations.  Defendant wrongfully refused to accommodate or even consider Grodman's formal request for accommodations.  Finally, Grodman was terminated after he submitted his formal request for reasonable accommodations.

78.     The Rehabilitation Act authorizes injunctive and equitable relief as appropriate to remedy acts of discrimination against persons with disabilities. 29 U.S.C. § 794a(a)(2). Grodman is entitled to injunctive and equitable relief, including reinstatement, to prevent continued violation of the Rehabilitation Act.

## VII.    SECOND CAUSE OF ACTION FOR VIOLATION OF PROCEDURAL DUE PROCESS PURSUANT TO 42 U.S.C. § 1983 (Against Texas Tech and Kaylani, Individually)

79.     Grodman repeats and re-alleges each and every allegation in the preceding paragraphs.

80.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that: "No State shall … deprive any person of life, liberty, or property, without due process of law." *U.S. Const. amend. XIV, § 1.*

81.     Grodman had a constitutionally protected property in his position at Texas Tech as a Third-Year Resident in the Pediatrics Program.  As a resident, Grodman enjoyed a broader property interest in his position than continued receipt of a paycheck including his engagement in experience, graduate medical school education, maintenance of his standing, completed residency terms, and the opportunity to become a licensed physician.

82.     Beginning December 5, 2021, the date of the Committee's "emergency" vote to terminate Grodman, Grodman was deprived of his constitutionally protected procedural due process rights to adequate notice and opportunity to be heard before termination of his protected interest in his medical residency.

83.     The deprivations of Grodman's constitutional interests that began on December 5, 2021, were done without any notice or process to Grodman, not even under the procedures required by Texas Tech's own policies, much less the constitutionally mandated sufficient notice and opportunity to be heard before he was deprived of the protected interests at issue.

84.     As a Third-Year member of Texas Tech's Residency Program, Grodman had a constitutionally protected valid entitlement to continued employment at the University.

85.     Following his January 2022 termination from the University, Grodman's career prospects as a doctor have been conclusively destroyed.

86.     The termination process is extraordinarily severe and thus Texas Tech must comply with various procedural and due process requirements.  However, in Dr. Grodman's case, Kaylani wholly ignored these governing policies.

87.     Under Texas Tech's internal policies, probation is determined by a committee at Texas Tech (the "Clinical Competency Committee"), headed by the program director (Kaylani). Only if the individual fails to improve based on the matters identified during probation or engages

in further seriously deficient conduct, then Texas Tech can seek to terminate the resident. Under Texas Tech procedures, a resident is usually given at least *sixty days* (60) after probation before termination is considered so that the resident can show improvement.

88.     Moreover, recognizing state requirements and the mandate of federal law, Texas Tech has a non-discrimination policy and a specific policy covering the ADA (§ 51.04). Under Texas Tech's policy, it must not discriminate on the basis of a disability and must provide reasonable accommodations. "When an employer does not engage in a good faith interactive process, that employer violates the ADA – including when the employer discharges the employee instead of considering the requested accommodations." *EEOC v. Chevron Phillips Chem. Co*., 570 F.3d 606, 622 (5th Cir. 2009). This is exactly what happened here.

89.     During the probation and termination process, Grodman made at least two requests for accommodation, including having Kaylani consider his disability in deciding his termination. Yet Kaylani simply misled Grodman about the ongoing proceedings and refused to engage. Kaylani never made any effort to accommodate Dr. Grodman, engage in the interactive process, or even discuss Dr. Grodman's requests for reasonable accommodation. This is because the results of the CCC termination proceeding had been *pre-determined* by Kaylani and thus the reasons justifying the termination were merely pretextual in nature. Again, the evidence of Kaylani's lack of total engagement includes the rapid speed by which Texas Tech instituted the termination proceeding.

90.     Grodman did, and still does, challenge the truth and integrity of Texas Tech's termination process, which was spearheaded by Kaylani, and its dismissal recommendation by the Committee, which was made without the Committee even considering Grodman's request for

accommodations.  As such, these actions were taken without cause and were arbitrary and capricious.

91.     As set forth more fully herein, Defendant Kaylani's actions violated Grodman's right(s) not to be deprived of his property and/or liberty interests without due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution.

92.     As set forth more fully herein, Defendant Kaylani's actions described above were taken without cause and/or for reasons that were arbitrary and capricious, and alternatively were outside the scope of Kaylani's authority.

93.     As set forth more fully herein, Defendant Kaylani's actions, in his individual capacity, violated Plaintiff's due process right(s) to be free from arbitrary and capricious deprivations of property under the Fourteenth Amendment of the United States Constitution.

94.     As set forth more fully herein, the constitutional violations against Grodman are of an ongoing and continuous nature because Grodman remains unable to become a licensed physician in Texas without reinstatement.  To this day, even after leaving his post at Texas Tech, Kaylani continues to interfere with Grodman's prospects of becoming a doctor.

95.     In taking the actions against Grodman set forth more fully above, Defendant Kaylani acted intentionally, maliciously, and unlawfully without providing Grodman procedural and substantive due process in violation of governing law.

## VIII.   REQUEST FOR JURY TRIAL

96.     Grodman requests a jury trial.

## IX.     ATTORNEY'S FEES UNDER TITLE VII

97.     Pursuant to Title VII, Grodman sues the Defendant for all reasonable attorney's fees and costs incurred in the prosecution of this suit.

## X.     REQUESTED RELIEF

98.     Grodman seeks equitable relief necessary to allow him to become a doctor and make use of his years of medical education and preparation.  After the improper termination by Texas Tech, Grodman has sought to re-apply or transfer to other medical programs.  However, as part of any such application and admissions process, Texas Tech or Kaylani will send documents reflecting the dismissal and Texas Tech's explanation, including disciplinary documentation, and will further deprive Grodman of his protected property interests by resulting in harm to Grodman's professional reputation, preventing him from being accepted at another medical school or program.  These mechanisms continue to prevent Grodman from obtaining a medical license and from becoming a pediatrician.  Grodman requests reinstatement, and that Grodman's records be corrected so that his dismissal and/or disciplinary proceedings initiated by Texas Tech and Kaylani during his third year no longer prevent Grodman's acceptance as to any medical school or licensure program.

99.     Upon information and belief, even more recently, Kaylani has contacted the American Board of Pediatrics regarding Grodman's disciplinary record at Texas Tech.  These actions and future actions by Texas Tech and Kaylani a continuation of all conduct complained herein, including the wrongful termination, constitute ongoing violations of Grodman's protected interests. Defendants' refusal to release academic records interferes with Grodman's constitutionally protected interest in attending medical school or another program. Indeed, Defendants' refusal to release Grodman's records and previous letters of recommendation precludes Grodman's ability to provide the documents necessary to apply to other schools and to be reinstated.

100.     Grodman was successfully promoted to his third year as a pediatrics resident, and Texas Tech's withholding of the academic records and recommendations issued at the end of those

two years constitute ongoing violations based on the conduct complaint herein. The wrongful disciplinary measures implemented against Grodman during his third year should be stricken and expunged and removed from Grodman's record and should not be further disclosed to Grodman's prospective schools and programs or licensing boards, such as the American Board of Pediatrics. These corrections to Grodman's record and the release of Grodman's transcript and other academic records showing Grodman's fulfillment of two years of residency will remedy the prior and ongoing violations alleged herein because it will allow Grodman to be reinstated and continue his career.

**XI.    PRAYER**

WHEREFORE Grodman requests that the Defendant be cited to appear and answer and that Grodman be awarded:

A.    Injunctive relief;

B.    Expungement of probation;

C.    Release of academic records;

D.    Reinstatement;

E.    Any further relief to which he may be justly entitled.

Date: December 4, 2023                          Respectfully Submitted,

                                                */s/ Jeffrey M. Tillotson*
                                                Jeffrey M. Tillotson
                                                State Bar No. 20039200
                                                jtillotson@tillotsonlaw.com
                                                Enrique Ramirez-Martinez
                                                State Bar No. 24122158
                                                eramirez@tillotsonlaw.com
                                                **TILLOTSON JOHNSON & PATTON**
                                                1201 Main Street, Suite 1300
                                                Dallas, Texas 75202
                                                (214) 382-3041 Telephone
                                                (214) 292-6564 Facsimile

                                                **ATTORNEYS FOR PLAINTIFF**


### CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Original Complaint and Jury Demand was electronically filed with the Clerk of the Court using the CM/ECF system on December 4, 2023.

                                                */s/ Jeffrey M. Tillotson*
                                                Jeffrey M. Tillotson

Exhibit A

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**El Paso Area Office**
100 N. Stanton Street, Suite 600
El Paso, TX  79901
(800) 669-4000
Website:  www.eeoc.gov

## <u>DETERMINATION AND NOTICE OF RIGHTS</u>
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 06/13/2023

**To:** Schyler Z. Grodman
392 Fairmount Road
Califon, NJ 07830

Charge No: 450-2022-05414

EEOC Representative and email:   SUSANA NAHAS
Investigator
susana.nahas@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 450-2022-05414.

On behalf of the Commission,

Digitally Signed By:Travis M. Nicholson
06/13/2023

Travis M. Nicholson
District Director

**Cc:**
Victor M Mellinger
Texas Tech University
Po Box 42021
Lubbock, TX 79409

Jeffrey M Tillotson
1807 Ross Avenue Suite 325
Dallas, TX 75201

Jeffrey M Tillotson
Tillotson Johnson & Patton
1807 Ross Ave
DALLAS, TX 75201


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 450-2022-05414 to the District Director at Travis M. Nicholson, 207 S. Houston Street 3rd Floor

Dallas, TX 75202.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

Enclosure with EEOC Notice of Closure and Rights (01/22)

You may request the charge file up to 90 days after receiving this Notice of Right to Sue.  After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system**.**

- ✓ **Only one** major life activity need be substantially limited.

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or "**in remission**" (e.g., cancer) is a disability if it **would be substantially limiting when active**.

- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

Enclosure with EEOC Notice of Closure and Rights (01/22)

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For moreinformation, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

# Exhibit B

**Zaid-Kaylani, Samer**

| | |
|---|---|
| **From:** | Faircloth, Johnnie |
| **Sent:** | Sunday, December 05, 2021 2:51 PM |
| **To:** | Zaid-Kaylani, Samer |
| **Subject:** | RE: Urgent and highly confidential |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

I vote to place on probation.

-------- Original message --------
From: "Zaid-Kaylani, Samer" <Samer.Zaid-Kaylani@ttuhsc.edu>
Date: 12/5/21 2:25 PM (GMT-06:00)
To: "Herrick, Shannon" <Shannon.Herrick@ttuhsc.edu>, "Faircloth, Johnnie" <Johnnie.Faircloth@ttuhsc.edu>,
"Bhaskaran, Smita" <Smita.Bhaskaran@ttuhsc.edu>, "Arawiran, Jenda" <Jenda.Arawiran@ttuhsc.edu>, "Steans, Stacy"
<Stacy.Steans@ttuhsc.edu>, "Lunsford, Alison" <Alison.Lunsford@ttuhsc.edu>, "Mattamal, Raphael"
<Raphael.Mattamal@ttuhsc.edu>, "Griffin, Mandy" <Mandy.Griffin@ttuhsc.edu>, "Alapati, Srilatha"
<Srilatha.Alapati@ttuhsc.edu>
Subject: Urgent and highly confidential

Dear CCC members,

I am calling for an urgent vote on placing Dr Zane Grodman on immediate probation with possible path to
termination. Multiple incidences have occurred and with major concerns occurring in his call coverage
yesterday.

Dr Grodman was on call yesterday Saturday 12/4/2021, this is a call he had chosen to take for          who was
going to take his call later on in the month. He has been aware of this call for months now. He is currently on a
light rotation with Neurology.

During the daytime he had an unusual finding by Dr Mattamal of not going into the patients' rooms during
rounds and staying outside while rounding with the faculty. The service was not busy at that time and he
actually was told to go into the room as one of the patients was his own CC patient whose the parent was
asking for.  That evening we had multiple admissions on my service and the GenPeds service. He seemed to
have handled these initially well however, it was reported by the night nurses that he stayed in the resident
call room and didnt come out during the night to support his intern.

One of the outside ERs called Dr Mattamal about a patient with fever and severe anemia (One of the hemonc
patients with severe hemolysis due to Elliptocytosis), Myself and Dr Mattamal discussed a detailed plan that
we both agreed on for this child and this was discussed with Dr Grodman, this included fluid
replacement/transfusion/antibiotics. I had stressed to him that this child is very sick and unless addressed
immediately may have a bad outcome.  Child's Hg was 7.6, CRP 230, UA positive for WBCs and nitrite. Patient
was admitted at 1:40, given a bolus, no further fluids written, no antibiotics written, patient doesnt look like
any re-evaluation done. I received a text by Dr Mattamal this morning at 7:15 that the patient never received
any antibiotics (today's senior "second year resident" felt it was weird she was not on antibiotics so called the

attending to check), I arrived at the hospital at 7:40 and saw the patient in warm shock status (HR 170, BP 100/50, pale looking with the blood had just finished. No fluids were given after the initial bolus. Antibiotics were still not given although they were now in the room as the new senior had ordered them. Patient needed multiple lines for multiple urgent infusions however due to her clinical status Jill (one of our most senior nurses) couldnt get an IV, child was moved immediately to the PICU, more fluids given urgently and then more access obtained, antibiotics given and child showed improvement in her clinic status, Hg post transfusion with a total of 22 ml/kg  transfused only went to 8 (from 7) due to active hemolysis. Patient was febrile during the whole morning period. Luckily this patient will be ok, lots of red flags in management.

At the same time I witnessed the new senior being called to another room because the patient that was admitted last night with AGE like picture and dehydration was peeing very dark urine (as per the nurse looked like thick cheese!), patient had got one bolus only and then placed on maintenance with no re-evaluation noted for response post admission.

Minutes later tthe resident was called to a third child who was vomiting bile for possible intestinal obstruction on the surgery service, similarly patient was on maintenance only.

About one week ago, Zane entered the seizure medication for a child into Allscripts as a documentation. The dose was 4 times the dose he was actually on, Isreal was asked to refill the medication for the patient sometime later, Luckily Mireya somehow caught the mistake and the medication was never refilled at the wrong dose.

About two weeks ago, one of the mother's of a baby complained to Dr Leverton about Zane being very rude to her and trying to  forcefully retract the foreskin on her 2 week old baby despite her asking him repeatedly not to do it.

On his last call with Dr Leverton about 1.5 months ago, there were multiple issues that were raised, one baby less than 1 month of age was admitted, only fluids placed on the baby, Dr Grodman mentioned he was not aware of the child having fever despite the night nurse repeatedly questioning him why the child was not getting antibiotics with the fever! When he called the attending about the child he didnt mention the child had a fever. The attending found out about the fever in the morning when the new senior resident informed him and did the appropriate work up needed and therapy. Dr Grodman also discharged a patient with asthma home from the ER without notifying Dr Leverton or discussing the case with him, this happened despite having Dr Leverton being at the hospital in the nursery at the time. During that call, he was in the call room and failed to respond to Dr Bhaskaran's phone calls about a patient being admitted and she had to ask the nurse to knock on the door to wake him up. He was apologitc about the incident though.

I am not sure what is going on with Zane since he came back from Dallas in September but repeated concerns have been voiced by residents/faculty and nurses. I am worried about the safety of patients under his care. I think he is a dangerous resident.

I ask everyone to go ahead and vote for immediate placement in probation status with possible eventual decision for termination. We will discuss the case further with the GME administration.

Sincerely,

Samer Zaid Kaylani, MD, FAAP
Pediatric Program Director

2

Exhibit C

## Zaid-Kaylani, Samer

| | |
|---|---|
| **From:** | Steans, Stacy |
| **Sent:** | Sunday, December 05, 2021 2:52 PM |
| **To:** | Bhaskaran, Smita; Zaid-Kaylani, Samer |
| **Cc:** | Herrick, Shannon; Faircloth, Johnnie; Arawiran, Jenda; Lunsford, Alison; Mattamal, Raphael; Griffin, Mandy; Alapati, Srilatha |
| **Subject:** | Re: Urgent and highly confidential |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

These are not the usual run of the mill errors expected from a senior pediatric resident.  I am afraid we all have tried our best to express the seriousness needed to care for our children currently and those yet to come.  I would have to vote for immediate dismissal.

Sincerely,

Stacy T. Steans, MD, MBA

Get Outlook for iOS

---

**From:** Bhaskaran, Smita <Smita.Bhaskaran@ttuhsc.edu>
**Sent:** Sunday, December 5, 2021 2:45:59 PM
**To:** Zaid-Kaylani, Samer <Samer.Zaid-Kaylani@ttuhsc.edu>
**Cc:** Herrick, Shannon <Shannon.Herrick@ttuhsc.edu>; Faircloth, Johnnie <Johnnie.Faircloth@ttuhsc.edu>; Arawiran, Jenda <Jenda.Arawiran@ttuhsc.edu>; Steans, Stacy <Stacy.Steans@ttuhsc.edu>; Lunsford, Alison <Alison.Lunsford@ttuhsc.edu>; Mattamal, Raphael <Raphael.Mattamal@ttuhsc.edu>; Griffin, Mandy <Mandy.Griffin@ttuhsc.edu>; Alapati, Srilatha <Srilatha.Alapati@ttuhsc.edu>
**Subject:** Re: Urgent and highly confidential

Dear Dr.Kaylani,

I vote Yes to proceed with probation/termination. We have made enough and more accommodations for him than any Program would have.

As I have said before, I worry about our  patients that will be placed under his care.

Thanks,

Smita

On Dec 5, 2021, at 2:25 PM, Zaid-Kaylani, Samer <Samer.Zaid-Kaylani@ttuhsc.edu> wrote:

Dear CCC members,

I am calling for an urgent vote on placing Dr Zane Grodman on immediate probation with possible path to termination. Multiple incidences have occurred and with major concerns occurring in his call coverage yesterday.

Dr Grodman was on call yesterday Saturday 12/4/2021, this is a call he had chosen to take for who was going to take his call later on in the month. He has been aware of this call for months now. He is currently on a light rotation with Neurology.

During the daytime he had an unusual finding by Dr Mattamal of not going into the patients' rooms during rounds and staying outside while rounding with the faculty. The service was not busy at that time and he actually was told to go into the room as one of the patients was his own CC patient whose the parent was asking for.  That evening we had multiple admissions on my service and the GenPeds service. He seemed to have handled these initially well however, it was reported by the night nurses that he stayed in the resident call room and didnt come out during the night to support his intern.

One of the outside ERs called Dr Mattamal about a patient with fever and severe anemia (One of the hemonc patients with severe hemolysis due to Elliptocytosis), Myself and Dr Mattamal discussed a detailed plan that we both agreed on for this child and this was discussed with Dr Grodman, this included fluid replacement/transfusion/antibiotics. I had stressed to him that this child is very sick and unless addressed immediately may have a bad outcome.  Child's Hg was 7.6, CRP 230, UA positive for WBCs and nitrite. Patient was admitted at 1:40, given a bolus, no further fluids written, no antibiotics written, patient doesnt look like any re-evaluation done. I received a text by Dr Mattamal this morning at 7:15 that the patient never received any antibiotics (today's senior "second year resident" felt it was weird she was not on antibiotics so called the attending to check), I arrived at the hospital at 7:40 and saw the patient in warm shock status (HR 170, BP 100/50, pale looking with the blood had just finished. No fluids were given after the initial bolus. Antibiotics were still not given although they were now in the room as the new senior had ordered them. Patient needed multiple lines for multiple urgent infusions however due to her clinical status Jill (one of our most senior nurses) couldnt get an IV, child was moved immediately to the PICU, more fluids given urgently and then more access obtained, antibiotics given and child showed improvement in her clinic status, Hg post transfusion with a total of 22 ml/kg  transfused only went to 8 (from 7) due to active hemolysis. Patient was febrile during the whole morning period. Luckily this patient will be ok, lots of red flags in management.

At the same time I witnessed the new senior being called to another room because the patient that was admitted last night with AGE like picture and dehydration was peeing very dark urine

2

(as per the nurse looked like thick cheese!), patient had got one bolus only and then placed on maintenance with no re-evaluation noted for response post admission.

Minutes later tthe resident was called to a third child who was vomiting bile for possible intestinal obstruction on the surgery service, similarly patient was on maintenance only.

About one week ago, Zane entered the seizure medication for a child into Allscripts as a documentation. The dose was 4 times the dose he was actually on, Isreal was asked to refill the medication for the patient sometime later, Luckily Mireya somehow caught the mistake and the medication was never refilled at the wrong dose.

About two weeks ago, one of the mother's of a baby complained to Dr Leverton about Zane being very rude to her and trying to  forcefully retract the foreskin on her 2 week old baby despite her asking him repeatedly not to do it.

On his last call with Dr Leverton about 1.5 months ago, there were multiple issues that were raised, one baby less than 1 month of age was admitted, only fluids placed on the baby, Dr Grodman mentioned he was not aware of the child having fever despite the night nurse repeatedly questioning him why the child was not getting antibiotics with the fever! When he called the attending about the child he didnt mention the child had a fever. The attending found out about the fever in the morning when the new senior resident informed him and did the appropriate work up needed and therapy. Dr Grodman also discharged a patient with asthma home from the ER without notifying Dr Leverton or discussing the case with him, this happened despite having Dr Leverton being at the hospital in the nursery at the time. During that call, he was in the call room and failed to respond to Dr Bhaskaran's phone calls about a patient being admitted and she had to ask the nurse to knock on the door to wake him up. He was apologitc about the incident though.

I am not sure what is going on with Zane since he came back from Dallas in September but repeated concerns have been voiced by residents/faculty and nurses. I am worried about the safety of patients under his care. I think he is a dangerous resident.

I ask everyone to go ahead and vote for immediate placement in probation status with possible eventual decision for termination. We will discuss the case further with the GME administration.

3

Sincerely,


Samer Zaid Kaylani, MD, FAAP
Pediatric Program Director
Associate Professor of Pediatrics

# Exhibit D

## Zaid-Kaylani, Samer

| | |
|---|---|
| **From:** | Mattamal, Raphael |
| **Sent:** | Sunday, December 05, 2021 3:02 PM |
| **To:** | Alapati, Srilatha; Bhaskaran, Smita |
| **Cc:** | Zaid-Kaylani, Samer; Herrick, Shannon; Faircloth, Johnnie; Arawiran, Jenda; Steans, Stacy; Lunsford, Alison; Griffin, Mandy |
| **Subject:** | Re: Urgent and highly confidential |

Hi all,

I am not happy to vote Yes on this, but I second Dr. Bhaskaran's comment. Most other programs would have terminated his employment by now. Dr. McLaurin-Jiang and Dr. Leverton have asked me repeatedly why he has not been terminated by the program yet, and I honestly don't have a good answer for them.

of a resident who did have quite a bit of issues, but did pretty well on the pediatric rotation to the point that I wrote a letter to the Amarillo program at his request supporting a probationary period rather than termination. I still think about him from time to time. Mostly because I think I would rather have him on service rather than Zane sometimes, and that's saying something. I've tried not to make it personal and have been much more patient with him than I would be with other residents.

This is not a decision to be taken lightly. I think it would have been better to rip the Band-Aid off a year or two ago, but here we are in the "home stretch" of his residency. He is not fit at this time for fellowship, and certainly not for independent attending physician practice. Whether this is due to a medical issue, psychiatric issue, or severe personality deficit, I don't know and honestly don't care at this stage. We are doing a disservice to our patients, our other residents, and our resident's future fellowship prospects (in that he would be a poison pill to any program that actually takes him for future Tech residents) by keeping him in our employ.

If this committee does not choose to put him on probation or termination, I will continue to work with Zane if he is posted to my team. But it is exceptionally unlikely at this stage that I will ever trust him.

Thanks,
Raph

**Raphael J. Mattamal, MD, FAAP   [He/Him/His]**
**Pediatric Hospitalist / Assistant Professor**
**Chief of the Department of Pediatrics - NWTHS**

raphael.mattamal@ttuhsc.edu

Privacy / Confidentiality Notice: This message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**From:** Alapati, Srilatha
**Sent:** Sunday, December 5, 2021 3:00:19 PM
**To:** Bhaskaran, Smita
**Cc:** Zaid-Kaylani, Samer; Herrick, Shannon; Faircloth, Johnnie; Arawiran, Jenda; Steans, Stacy; Lunsford, Alison; Mattamal, Raphael; Griffin, Mandy
**Subject:** Re: Urgent and highly confidential

Hi Samer,
In keeping the safety of the patients, I vote yes for probation. I do agree that we had given him multiple chances to improve and still showed no improvement. This is not appropriate level of care for a third year resident. At least here he has faculty/ other residents to find his mistakes and rectify them in time to save the patients, but worried even more about the safety of the patients after graduation.

1

Srilatha.

Thank you

Sent from my iPhone

On Dec 5, 2021, at 2:46 PM, Bhaskaran, Smita <Smita.Bhaskaran@ttuhsc.edu> wrote:

Dear Dr.Kaylani,

I vote Yes to proceed with probation/termination. We have made enough and more accommodations for him than any Program would have.

As I have said before, I worry about our patients that will be placed under his care.

Thanks,

Smita

On Dec 5, 2021, at 2:25 PM, Zaid-Kaylani, Samer <Samer.Zaid-Kaylani@ttuhsc.edu> wrote:

Dear CCC members,

I am calling for an urgent vote on placing Dr Zane Grodman on immediate probation with possible path to termination. Multiple incidences have occurred and with major concerns occurring in his call coverage yesterday.

Dr Grodman was on call yesterday Saturday 12/4/2021, this is a call he had chosen to take for . ___ who was going to take his call later on in the month. He has been aware of this call for months now. He is currently on a light rotation with Neurology.

During the daytime he had an unusual finding by Dr Mattamal of not going into the patients' rooms during rounds and staying outside while rounding with the faculty. The service was not busy at that time and he actually was told to go into the room as one of the patients was his own CC patient whose the parent was asking for. That evening we had multiple admissions on my service and the GenPeds service. He seemed to have handled these initially well however, it was reported by the night nurses that he stayed in the resident call room and didnt come out during the night to support his intern.

One of the outside ERs called Dr Mattamal about a patient with fever and severe anemia (One of the hemonc patients with severe hemolysis due to Elliptocytosis), Myself and Dr Mattamal discussed a detailed plan that we both

2

agreed on for this child and this was discussed with Dr Grodman, this included fluid replacement/transfusion/antibiotics. I had stressed to him that this child is very sick and unless addressed immediately may have a bad outcome.  Child's Hg was 7.6, CRP 230, UA positive for WBCs and nitrite. Patient was admitted at 1:40, given a bolus, no further fluids written, no antibiotics written, patient doesnt look like any re-evaluation done. I received a text by Dr Mattamal this morning at 7:15 that the patient never received any antibiotics (today's senior "second year resident" felt it was weird she was not on antibiotics so called the attending to check), I arrived at the hospital at 7:40 and saw the patient in warm shock status (HR 170, BP 100/50, pale looking with the blood had just finished. No fluids were given after the initial bolus. Antibiotics were still not given although they were now in the room as the new senior had ordered them. Patient needed multiple lines for multiple urgent infusions however due to her clinical status Jill (one of our most senior nurses) couldnt get an IV, child was moved immediately to the PICU, more fluids given urgently and then more access obtained, antibiotics given and child showed improvement in her clinic status, Hg post transfusion with a total of 22 ml/kg  transfused only went to 8 (from 7) due to active hemolysis. Patient was febrile during the whole morning period. Luckily this patient will be ok, lots of red flags in management.

At the same time I witnessed the new senior being called to another room because the patient that was admitted last night with AGE like picture and dehydration was peeing very dark urine (as per the nurse looked like thick cheese!), patient had got one bolus only and then placed on maintenance with no re-evaluation noted for response post admission.

Minutes later tthe resident was called to a third child who was vomiting bile for possible intestinal obstruction on the surgery service, similarly patient was on maintenance only.

About one week ago, Zane entered the seizure medication for a child into Allscripts as a documentation. The dose was 4 times the dose he was actually on, Isreal was asked to refill the medication for the patient sometime later, Luckily Mireya somehow caught the mistake and the medication was never refilled at the wrong dose.

About two weeks ago, one of the mother's of a baby complained to Dr Leverton about Zane being very rude to her and trying to  forcefully retract the foreskin on her 2 week old baby despite her asking him repeatedly not to do it.

On his last call with Dr Leverton about 1.5 months ago, there were multiple issues that were raised, one baby less than 1 month of age was admitted, only fluids placed on the baby, Dr Grodman mentioned he was not aware of the child having fever despite the night nurse repeatedly questioning him why the child was not getting antibiotics with the fever! When he called the attending about the child he didnt mention the child had a fever. The attending found out about the fever in the morning when the new senior resident informed him and did the appropriate work up needed and therapy. Dr Grodman also discharged a patient

3

with asthma home from the ER without notifying Dr Leverton or discussing the case with him, this happened despite having Dr Leverton being at the hospital in the nursery at the time. During that call, he was in the call room and failed to respond to Dr Bhaskaran's phone calls about a patient being admitted and she had to ask the nurse to knock on the door to wake him up. He was apologitc about the incident though.

I am not sure what is going on with Zane since he came back from Dallas in September but repeated concerns have been voiced by residents/faculty and nurses. I am worried about the safety of patients under his care. I think he is a dangerous resident.

I ask everyone to go ahead and vote for immediate placement in probation status with possible eventual decision for termination. We will discuss the case further with the GME administration.

Sincerely,

Samer Zaid Kaylani, MD, FAAP
Pediatric Program Director
Associate Professor of Pediatrics

# Exhibit E

## Zaid-Kaylani, Samer

| | |
|---|---|
| **From:** | Arawiran, Jenda |
| **Sent:** | Sunday, December 05, 2021 3:06 PM |
| **To:** | Zaid-Kaylani, Samer |
| **Subject:** | RE: Urgent and highly confidential |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

I agree to place Zane on probation then possible termination. Sad but necessary.

Please excuse errors and brevity, sent from my mobile device.

Jenda M. Arawiran

-------- Original message --------
From: "Zaid-Kaylani, Samer" <Samer.Zaid-Kaylani@ttuhsc.edu>
Date: 12/5/21 2:25 PM (GMT-06:00)
To: "Herrick, Shannon" <Shannon.Herrick@ttuhsc.edu>, "Faircloth, Johnnie" <Johnnie.Faircloth@ttuhsc.edu>, "Bhaskaran, Smita" <Smita.Bhaskaran@ttuhsc.edu>, "Arawiran, Jenda" <Jenda.Arawiran@ttuhsc.edu>, "Steans, Stacy" <Stacy.Steans@ttuhsc.edu>, "Lunsford, Alison" <Alison.Lunsford@ttuhsc.edu>, "Mattamal, Raphael" <Raphael.Mattamal@ttuhsc.edu>, "Griffin, Mandy" <Mandy.Griffin@ttuhsc.edu>, "Alapati, Srilatha" <Srilatha.Alapati@ttuhsc.edu>
Subject: Urgent and highly confidential

Dear CCC members,

I am calling for an urgent vote on placing Dr Zane Grodman on immediate probation with possible path to termination. Multiple incidences have occurred and with major concerns occurring in his call coverage yesterday.

Dr Grodman was on call yesterday Saturday 12/4/2021, this is a call he had chosen to take for            who was going to take his call later on in the month. He has been aware of this call for months now. He is currently on a light rotation with Neurology.

During the daytime he had an unusual finding by Dr Mattamal of not going into the patients' rooms during rounds and staying outside while rounding with the faculty. The service was not busy at that time and he actually was told to go into the room as one of the patients was his own CC patient whose the parent was asking for. That evening we had multiple admissions on my service and the GenPeds service. He seemed to have handled these initially well however, it was reported by the night nurses that he stayed in the resident call room and didnt come out during the night to support his intern.

One of the outside ERs called Dr Mattamal about a patient with fever and severe anemia (One of the hemonc patients with severe hemolysis due to Elliptocytosis), Myself and Dr Mattamal discussed a detailed plan that

we both agreed on for this child and this was discussed with Dr Grodman, this included fluid replacement/transfusion/antibiotics. I had stressed to him that this child is very sick and unless addressed immediately may have a bad outcome. Child's Hg was 7.6, CRP 230, UA positive for WBCs and nitrite. Patient was admitted at 1:40, given a bolus, no further fluids written, no antibiotics written, patient doesnt look like any re-evaluation done. I received a text by Dr Mattamal this morning at 7:15 that the patient never received any antibiotics (today's senior "second year resident" felt it was weird she was not on antibiotics so called the attending to check), I arrived at the hospital at 7:40 and saw the patient in warm shock status (HR 170, BP 100/50, pale looking with the blood had just finished. No fluids were given after the initial bolus. Antibiotics were still not given although they were now in the room as the new senior had ordered them. Patient needed multiple lines for multiple urgent infusions however due to her clinical status Jill (one of our most senior nurses) couldnt get an IV, child was moved immediately to the PICU, more fluids given urgently and then more access obtained, antibiotics given and child showed improvement in her clinic status, Hg post transfusion with a total of 22 ml/kg  transfused only went to 8 (from 7) due to active hemolysis. Patient was febrile during the whole morning period. Luckily this patient will be ok, lots of red flags in management.

At the same time I witnessed the new senior being called to another room because the patient that was admitted last night with AGE like picture and dehydration was peeing very dark urine (as per the nurse looked like thick cheese!), patient had got one bolus only and then placed on maintenance with no re-evaluation noted for response post admission.

Minutes later tthe resident was called to a third child who was vomiting bile for possible intestinal obstruction on the surgery service, similarly patient was on maintenance only.

About one week ago, Zane entered the seizure medication for a child into Allscripts as a documentation. The dose was 4 times the dose he was actually on, Isreal was asked to refill the medication for the patient sometime later, Luckily Mireya somehow caught the mistake and the medication was never refilled at the wrong dose.

About two weeks ago, one of the mother's of a baby complained to Dr Leverton about Zane being very rude to her and trying to  forcefully retract the foreskin on her 2 week old baby despite her asking him repeatedly not to do it.

On his last call with Dr Leverton about 1.5 months ago, there were multiple issues that were raised, one baby less than 1 month of age was admitted, only fluids placed on the baby, Dr Grodman mentioned he was not aware of the child having fever despite the night nurse repeatedly questioning him why the child was not getting antibiotics with the fever! When he called the attending about the child he didnt mention the child had a fever. The attending found out about the fever in the morning when the new senior resident informed him and did the appropriate work up needed and therapy. Dr Grodman also discharged a patient with asthma home from the ER without notifying Dr Leverton or discussing the case with him, this happened despite having Dr Leverton being at the hospital in the nursery at the time. During that call, he was in the call room and failed to respond to Dr Bhaskaran's phone calls about a patient being admitted and she had to ask the nurse to knock on the door to wake him up. He was apologitc about the incident though.

I am not sure what is going on with Zane since he came back from Dallas in September but repeated concerns have been voiced by residents/faculty and nurses. I am worried about the safety of patients under his care. I think he is a dangerous resident.

2

I ask everyone to go ahead and vote for immediate placement in probation status with possible eventual decision for termination. We will discuss the case further with the GME administration.

Sincerely,


Samer Zaid Kaylani, MD, FAAP
Pediatric Program Director
Associate Professor of Pediatrics

# Exhibit F

**Zaid-Kaylani, Samer**

| | |
|---|---|
| **From:** | Griffin, Mandy |
| **Sent:** | Sunday, December 05, 2021 4:21 PM |
| **To:** | Mattamal, Raphael |
| **Cc:** | Alapati, Srilatha; Bhaskaran, Smita; Zaid-Kaylani, Samer; Herrick, Shannon; Faircloth, Johnnie; Arawiran, Jenda; Steans, Stacy; Lunsford, Alison |
| **Subject:** | Re: Urgent and highly confidential |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

All,

I have read Dr. Kaylani's email and responses thus far. I support the decision to put him on immediate probation with the further discussion about termination.

Mandy

Sent from my iPhone

> On Dec 5, 2021, at 4:01 PM, Mattamal, Raphael <Raphael.Mattamal@ttuhsc.edu> wrote:

Hi all,

I am not happy to vote Yes on this, but I second Dr. Bhaskaran's comment. Most other programs would have terminated his employment by now. Dr. McLaurin-Jiang and Dr. Leverton have asked me repeatedly why he has not been terminated by the program yet, and I honestly don't have a good answer for them.

of a resident who did have quite a bit of issues, but did pretty well on the pediatric rotation to the point that I wrote a letter to the Amarillo program at his request supporting a probationary period rather than termination. I still think about him from time to time. Mostly because I think I would rather have him on service rather than Zane sometimes, and that's saying something. I've tried not to make it personal and have been much more patient with him than I would be with other residents.

This is not a decision to be taken lightly. I think it would have been better to rip the Band-Aid off a year or two ago, but here we are in the "home stretch" of his residency. He is not fit at this time for fellowship, and certainly not for independent attending physician practice. Whether this is due to a medical issue, psychiatric issue, or severe personality deficit, I don't know and honestly don't care at this stage. We are doing a disservice to our patients, our other residents, and our resident's future fellowship prospects (in that he would be a poison pill to any program that actually takes him for future Tech residents) by keeping him in our employ.

1

If this committee does not choose to put him on probation or termination, I will continue to work with Zane if he is posted to my team. But it is exceptionally unlikely at this stage that I will ever trust him.


Thanks,

Raph


**Raphael J. Mattamal, MD, FAAP   [He/Him/His]**
**Pediatric Hospitalist / Assistant Professor**
**Chief of the Department of Pediatrics - NWTHS**

**raphael.mattamal@ttuhsc.edu**

Privacy / Confidentiality Notice: This message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**From:** Alapati, Srilatha
**Sent:** Sunday, December 5, 2021 3:00:19 PM
**To:** Bhaskaran, Smita
**Cc:** Zaid-Kaylani, Samer; Herrick, Shannon; Faircloth, Johnnie; Arawiran, Jenda; Steans, Stacy; Lunsford, Alison; Mattamal, Raphael; Griffin, Mandy
**Subject:** Re: Urgent and highly confidential

Hi Samer,
In keeping the safety of the patients, I vote yes for probation. I do agree that we had given him multiple chances to improve and still showed no improvement. This is not appropriate level of care for a third year resident. At least here he has faculty/ other residents to find his mistakes and rectify them in time to save the patients, but worried even more about the safety of the patients after graduation.

Srilatha.

Thank you

Sent from my iPhone


> On Dec 5, 2021, at 2:46 PM, Bhaskaran, Smita <Smita.Bhaskaran@ttuhsc.edu> wrote:
>
> Dear Dr.Kaylani,
>
> I vote Yes to proceed with probation/termination. We have made enough and more accommodations for him than any Program would have.
>
> As I have said before, I worry about our patients that will be placed under his care.
>
> Thanks,
>
> Smita

2

On Dec 5, 2021, at 2:25 PM, Zaid-Kaylani, Samer <Samer.Zaid-Kaylani@ttuhsc.edu> wrote:

Dear CCC members,

I am calling for an urgent vote on placing Dr Zane Grodman on immediate probation with possible path to termination. Multiple incidences have occurred and with major concerns occurring in his call coverage yesterday.

Dr Grodman was on call yesterday Saturday 12/4/2021, this is a call he had chosen to take for          who was going to take his call later on in the month. He has been aware of this call for months now. He is currently on a light rotation with Neurology.

During the daytime he had an unusual finding by Dr Mattamal of not going into the patients' rooms during rounds and staying outside while rounding with the faculty. The service was not busy at that time and he actually was told to go into the room as one of the patients was his own CC patient whose the parent was asking for.  That evening we had multiple admissions on my service and the GenPeds service. He seemed to have handled these initially well however, it was reported by the night nurses that he stayed in the resident call room and didnt come out during the night to support his intern.

One of the outside ERs called Dr Mattamal about a patient with fever and severe anemia (One of the hemonc patients with severe hemolysis due to Elliptocytosis), Myself and Dr Mattamal discussed a detailed plan that we both agreed on for this child and this was discussed with Dr Grodman, this included fluid replacement/transfusion/antibiotics. I had stressed to him that this child is very sick and unless addressed immediately may have a bad outcome.  Child's Hg was 7.6, CRP 230, UA positive for WBCs and nitrite. Patient was admitted at 1:40, given a bolus, no further fluids written, no antibiotics written, patient doesnt look like any

3

re-evaluation done. I received a text by Dr Mattamal this morning at 7:15 that the patient never received any antibiotics (today's senior "second year resident" felt it was weird she was not on antibiotics so called the attending to check), I arrived at the hospital at 7:40 and saw the patient in warm shock status (HR 170, BP 100/50, pale looking with the blood had just finished. No fluids were given after the initial bolus. Antibiotics were still not given although they were now in the room as the new senior had ordered them. Patient needed multiple lines for multiple urgent infusions however due to her clinical status Jill (one of our most senior nurses) couldnt get an IV, child was moved immediately to the PICU, more fluids given urgently and then more access obtained, antibiotics given and child showed improvement in her clinic status, Hg post transfusion with a total of 22 ml/kg  transfused only went to 8 (from 7) due to active hemolysis. Patient was febrile during the whole morning period. Luckily this patient will be ok, lots of red flags in management.

At the same time I witnessed the new senior being called to another room because the patient that was admitted last night with AGE like picture and dehydration was peeing very dark urine (as per the nurse looked like thick cheese!), patient had got one bolus only and then placed on maintenance with no re-evaluation noted for response post admission.

Minutes later tthe resident was called to a third child who was vomiting bile for possible intestinal obstruction on the surgery service, similarly patient was on maintenance only.

About one week ago, Zane entered the seizure medication for a child into Allscripts as a documentation. The dose was 4 times the dose he was actually on, Isreal was asked to refill the medication for the patient sometime later, Luckily Mireya somehow caught the mistake and the medication was never refilled at the wrong dose.

About two weeks ago, one of the mother's of a baby complained to Dr Leverton about Zane being very rude to her and trying to  forcefully retract the foreskin on her 2 week old baby despite her asking him repeatedly not to do it.

4

On his last call with Dr Leverton about 1.5 months ago, there were multiple issues that were raised, one baby less than 1 month of age was admitted, only fluids placed on the baby, Dr Grodman mentioned he was not aware of the child having fever despite the night nurse repeatedly questioning him why the child was not getting antibiotics with the fever! When he called the attending about the child he didnt mention the child had a fever. The attending found out about the fever in the morning when the new senior resident informed him and did the appropriate work up needed and therapy. Dr Grodman also discharged a patient with asthma home from the ER without notifying Dr Leverton or discussing the case with him, this happened despite having Dr Leverton being at the hospital in the nursery at the time. During that call, he was in the call room and failed to respond to Dr Bhaskaran's phone calls about a patient being admitted and she had to ask the nurse to knock on the door to wake him up. He was apologitc about the incident though.

I am not sure what is going on with Zane since he came back from Dallas in September but repeated concerns have been voiced by residents/faculty and nurses. I am worried about the safety of patients under his care. I think he is a dangerous resident.

I ask everyone to go ahead and vote for immediate placement in probation status with possible eventual decision for termination. We will discuss the case further with the GME administration.

Sincerely,


Samer Zaid Kaylani, MD, FAAP
Pediatric Program Director
Associate Professor of Pediatrics

Exhibit G

**Zaid-Kaylani, Samer**

| | |
|---|---|
| **From:** | Lunsford, Alison |
| **Sent:** | Monday, December 06, 2021 8:08 AM |
| **To:** | Zaid-Kaylani, Samer |
| **Subject:** | RE: Urgent and highly confidential |

**Follow Up Flag:**  Follow up
**Flag Status:**  Flagged


Samer

I vote yes to placing him on immediate probation.

Alison

**From:** Zaid-Kaylani, Samer <Samer.Zaid-Kaylani@ttuhsc.edu>
**Sent:** Sunday, December 05, 2021 2:25 PM
**To:** Herrick, Shannon <Shannon.Herrick@ttuhsc.edu>; Faircloth, Johnnie <Johnnie.Faircloth@ttuhsc.edu>; Bhaskaran, Smita <Smita.Bhaskaran@ttuhsc.edu>; Arawiran, Jenda <Jenda.Arawiran@ttuhsc.edu>; Steans, Stacy <Stacy.Steans@ttuhsc.edu>; Lunsford, Alison <Alison.Lunsford@ttuhsc.edu>; Mattamal, Raphael <Raphael.Mattamal@ttuhsc.edu>; Griffin, Mandy <Mandy.Griffin@ttuhsc.edu>; Alapati, Srilatha <Srilatha.Alapati@ttuhsc.edu>
**Subject:** Urgent and highly confidential
**Importance:** High

Dear CCC members,

I am calling for an urgent vote on placing Dr Zane Grodman on immediate probation with possible path to termination. Multiple incidences have occurred and with major concerns occurring in his call coverage yesterday.

Dr Grodman was on call yesterday Saturday 12/4/2021, this is a call he had chosen to take for         who was going to take his call later on in the month. He has been aware of this call for months now. He is currently on a light rotation with Neurology.

During the daytime he had an unusual finding by Dr Mattamal of not going into the patients' rooms during rounds and staying outside while rounding with the faculty. The service was not busy at that time and he actually was told to go into the room as one of the patients was his own CC patient whose the parent was asking for.  That evening we had multiple admissions on my service and the GenPeds service. He seemed to have handled these initially well however, it was reported by the night nurses that he stayed in the resident call room and didnt come out during the night to support his intern.

One of the outside ERs called Dr Mattamal about a patient with fever and severe anemia (One of the hemonc patients with severe hemolysis due to Elliptocytosis), Myself and Dr Mattamal discussed a detailed plan that we both agreed on for this child and this was discussed with Dr Grodman, this included fluid replacement/transfusion/antibiotics. I had stressed to him that this child is very sick and unless addressed immediately may have a bad outcome.  Child's Hg was 7.6, CRP 230, UA positive for WBCs and nitrite. Patient

was admitted at 1:40, given a bolus, no further fluids written, no antibiotics written, patient doesnt look like any re-evaluation done. I received a text by Dr Mattamal this morning at 7:15 that the patient never received any antibiotics (today's senior "second year resident" felt it was weird she was not on antibiotics so called the attending to check), I arrived at the hospital at 7:40 and saw the patient in warm shock status (HR 170, BP 100/50, pale looking with the blood had just finished. No fluids were given after the initial bolus. Antibiotics were still not given although they were now in the room as the new senior had ordered them. Patient needed multiple lines for multiple urgent infusions however due to her clinical status Jill (one of our most senior nurses) couldnt get an IV, child was moved immediately to the PICU, more fluids given urgently and then more access obtained, antibiotics given and child showed improvement in her clinic status, Hg post transfusion with a total of 22 ml/kg  transfused only went to 8 (from 7) due to active hemolysis. Patient was febrile during the whole morning period. Luckily this patient will be ok, lots of red flags in management.

At the same time I witnessed the new senior being called to another room because the patient that was admitted last night with AGE like picture and dehydration was peeing very dark urine (as per the nurse looked like thick cheese!), patient had got one bolus only and then placed on maintenance with no re-evaluation noted for response post admission.

Minutes later tthe resident was called to a third child who was vomiting bile for possible intestinal obstruction on the surgery service, similarly patient was on maintenance only.

About one week ago, Zane entered the seizure medication for a child into Allscripts as a documentation. The dose was 4 times the dose he was actually on, Isreal was asked to refill the medication for the patient sometime later, Luckily Mireya somehow caught the mistake and the medication was never refilled at the wrong dose.

About two weeks ago, one of the mother's of a baby complained to Dr Leverton about Zane being very rude to her and trying to  forcefully retract the foreskin on her 2 week old baby despite her asking him repeatedly not to do it.

On his last call with Dr Leverton about 1.5 months ago, there were multiple issues that were raised, one baby less than 1 month of age was admitted, only fluids placed on the baby, Dr Grodman mentioned he was not aware of the child having fever despite the night nurse repeatedly questioning him why the child was not getting antibiotics with the fever! When he called the attending about the child he didnt mention the child had a fever. The attending found out about the fever in the morning when the new senior resident informed him and did the appropriate work up needed and therapy. Dr Grodman also discharged a patient with asthma home from the ER without notifying Dr Leverton or discussing the case with him, this happened despite having Dr Leverton being at the hospital in the nursery at the time. During that call, he was in the call room and failed to respond to Dr Bhaskaran's phone calls about a patient being admitted and she had to ask the nurse to knock on the door to wake him up. He was apologitc about the incident though.

I am not sure what is going on with Zane since he came back from Dallas in September but repeated concerns have been voiced by residents/faculty and nurses. I am worried about the safety of patients under his care. I think he is a dangerous resident.

I ask everyone to go ahead and vote for immediate placement in probation status with possible eventual decision for termination. We will discuss the case further with the GME administration.

Sincerely,

2

Samer Zaid Kaylani, MD, FAAP
Pediatric Program Director
Associate Professor of Pediatrics

# Exhibit H



TEXAS TECH UNIVERSITY
**HEALTH SCIENCES CENTER**
*at Amarillo*

*Department of Pediatrics*

**CONFIDENTIAL-PEER REVIEW**

March 23, 2020

**Via Hand Delivery:**
Schyler Zane Grodman, MD
PGY 1, Pediatric Resident
1400 S. Coulter

RE:   Letter of Observation

Dear Dr. Grodman,

This letter is to notify you that effective March 23, 2020, you are being placed on a period of observation due to your medical knowledge, professionalism competency, system based competency, patient care, practice based learning, and interpersonal skill deficiencies as outlined by ACGME for physicians in training.

1. Medical knowledge:  Concerns have been voiced by faculty and senior residents about the depth of your medical knowledge and your ability to address the different medical diseases that patients may have. The thoroughness of your history taking, patient medical exam and ability to formulate a differential have been below the level expected for a resident at your level of training.

Suggested solutions:
- Increase your reading on daily bases from Nelson Pediatric Text book
- Solve PREP questions on daily bases with adequate review of the answers and the explanation of each answer.
- Respectfully inquire from the attending's and senior residents (not question them) to learn from every case you are involved in.
- Set up meetings with your mentor every 2 weeks to review your active learning plan and progress.

2. Professionalism:  There have been concerns about your behavior towards your senior colleagues. For example, you have been disrespectful and behaved with an aggressive manner toward them. Additionally, you have made rude comments about some of the patients, along with a non-respectful approach towards the patients. Colleagues have noted in-appropriate language being used within the clinic setting and some nurses have voiced concerns about professionalism in addressing their questions and concerns.

Suggested solutions:

- Show adequate respect towards your attendings, senior residents, nurses, patients and their families.
- You are required to set up a meeting with the Wellness and Rehabilitation Committee at Texas Tech and follow their recommendations.
- Be mindful of all language used in front of your colleagues and patients.

3. System based competency:  There are concerns that you are not wanting to follow the systems that are in place for consultations related to patients. While we do encourage residents to try to improve systems, we still need to comply with established policies, and then find the appropriate venues to discuss and update them.

4. Patient Care: As mentioned above, there have been concerns that you don't attempt to establish rapport with the patient. Instead, you are more focused on completing the encounter, without addressing all the issues and families concerns.

Suggested Solution:

- Establish more rapport with the patients by spending adequate time with both the parents and patient.
- Discuss with your continuity attending about how to further improve on this aspect.

5. Practice-based learning and improvement: There has been adequate response to feedback over the past 9 months, however the change in response to feedback needs to be consistent and continuous.

6. Interpersonal Communication skills: This has been addressed in both the professionalism and the patient care points.

As per the above concerns, you will be observed closely for improvement in the points mentioned above and you will also be measured by:

1. OSCE exam achieving an average of B or higher.
2. Mock board exam with a minimum of 50% correct answers.
3. 1st year quiz involving case based questions and writing orders, need to achieve a 60% correct.
4. 5 clinical notes involving both clinic and hospital setting will be reviewed for accuracy and having all the points expected in the SOAP style.
5. Meeting with the Wellness and Rehabilitation Committee at Texas Tech and following their recommendations sufficiently.

Observation will start on March 23, 2020, and will be re-evaluated in the Clinical Competency Meeting on May 28, 2020. At that time, a decision will be made whether you have had a resolution/improvement in the aspects mentioned above. A failure to meet the expectation above will result in you being placed on probation, and the possibility of non-renewal of your contract. Being placed on a probation status is reportable to the Texas Medical Board.

This serves as a notification of such action,

Sincerely,

Samer Zaid Kaylani, MD, FAAP
Pediatric Program Director
Texas Tech University Health Sciences Center

Schyler Zane Grodman, MD
Pediatric Resident
Texas Tech University Health Sciences Center

Exhibit I

TEXAS TECH UNIVERSITY
HEALTH SCIENCES CENTER
*at Amarillo*

*Department of Pediatrics*

June 2, 2020

Schyler Zane Grodman, MD

Re: Observation Status update

Dear Dr. Grodman:

This letter is intended to inform you that the Clinical Competency Committee (CCC) met on 05/28/2020 and discussed your clinical and professional progress for the period 03/23/2020 to the date of the meeting. Data was provided from feedback from your supervising residents and attendings, mock board exam, Intern quiz and OSCE exam. The committee was also updated that you had met with the Committee on Physician Health, Wellness, and Rehabilitation (CHWR) via Zoom on May 7, 2020. The committee appreciated your voluntary participation and willingness to answer the committee's questions.

Based on the above information, it was the decision of the CCC to:
1. Remove you from the observation status that you were placed under
2. Consider the recommendations of the CHWR.
3. You can expect a review of your progress over the next 4 months (June-September 2020) at the CCC meeting scheduled for October 1st.

We commend you for the good effort at addressing the different concerns that were included in your original observation letter and urge you to continue to work hard on continuing your residency successfully.

Sincerely,

Samer Zaid Kaylani, MD, FAAP
Pediatric Program Director
Associate Professor of Pediatric
Hematology and Oncology

cc:
Kristin Stutz
Robert P. Kauffman, MD
Shannon Herrick, MD

# Exhibit J



TEXAS TECH UNIVERSITY
HEALTH SCIENCES CENTER
*at Amarillo*

*Department of Pediatrics*

December 17, 2021

Schyler Zane Grodman, MD
Department of Pediatrics
TTUHSC School of Medicine
1400 S. Coulter Drive
Amarillo, Texas  79106

Re: Probation Status

Dear Dr. Grodman:

This letter provides you notification that as of December 17, 2021, you are hereby placed on Probation status until a review of your "Probation Objectives" is completed by the Clinical Competency Committee (CCC) on March 24, 2022.

It was the decision of the CCC to place you on probation because of your failure to adequately remediate areas of academic deficiencies noted in prior corrective action plans; failure to meet the objectives expected for a third-year resident; your performance presents a serious comprise to acceptable standards of patient care; you are failing to progress satisfactorily in fund knowledge, skill acquisition and professional development; and your unprofessional conduct.

The following are major issues of concern:

1. **Medical knowledge:** Your most recent In-service Exam score showed a score of 56% correct answers with a scaled score of 143. Based on that, your predicted score of passing the board is at 61%. Your score is the lowest score among your same year colleagues. For your level of training the national average is 64% with a scaled score of 162. Also, a third year Mock Board exam was performed and you attained a very low score of 47.5% correct which is the lowest score as compared to your 3rd year colleagues.

2. **Patient care:** There have been multiple examples of serious patient related incidences that are considered major red flags in patient management and could have placed the patients in real morbid situations.
   a. You recently mismanaged a 3-year-old with severe hemolytic anemia and severe infection. Both faculty members had clearly discussed with Dr. Grodman that patient is having red cell breakdown due to a severe infection (her red blood cells are very sensitive to infection and they break). The fact that the patient was septic was stressed to the resident. Patient was considered as being in warm shock in the morning that could have progressed to severe complications and death. The patient did grow E.coli from her urine so a severe bacterial infection was present in this patient.
      i. We have discussed this case today during our discussion of the probation status.
   b. You had a five-year-old also admitted for severe acute Gastroenteritis, you placed the patient on regular maintenance fluids without rechecking if the patient

needed further fluid resuscitation. The patient had Rota virus, E.coli EPEC, Giardia and Adenovirus in the stool causing the severe vomiting and diarrhea that required close attention to fluids in this patient.

    i. We discussed this case today during our discussion of the probation status.

c. You recently took care of an 8-year-old asthmatic in the ER that you discharged home without communicating with the attending on service

    i. We discussed this incident with recommendations about your management on October 3rd, 2021.

d. You took care of a 5-week-old admitted from the ED with fever of 105. No antibiotics were started on this baby for almost 7 hours despite the nurses questioning why the child was not on antibiotics with the fever he had.

    i. We discussed this incident with recommendations about your management on October 3rd, 2021.

e. You recently entered the wrong dose on a child's anti-seizure medication into the Allscripts system that was fortunately caught before the patient had a refill on the wrong dose.

    i. We discussed this incident on November 30th, 2021 and reminded you of the importance of paying attention to detail and double checking your documentation.

f. We have just received evaluations from the faculty in Dallas that showed you had many areas of underperformance as a third-year resident. Some of the comments they have mentioned are:

    i. Major issues with patient care, inability to recognize sick versus not sick children and unprofessional behavior towards faculty.

        a. We have discussed these issues today during our discussion of the probation status.

3. Professionalism:

a. The current interns mention feeling very unsafe, from a patient care point, being on call with you. They have also mentioned concerns about your attitude and possible anger outbursts.

b. Inappropriate supervision of interns during your calls

c. The faculty have voiced serious concerns about you communicating with them about their patients. They mentioned that your history and physical are not at the level a 3rd year resident should be. There are major deficits that you are failing to collect that affect patient care.

d. Not abiding by the rules of Texas Tech in attending a rotation and seeing patients.

e. Unprofessional behavior towards children and ignoring the parent's requests.

    i. You were counseled about these different concerns with possible solutions on December 10, 2021

Probation Objectives

**Medical knowledge:**

1. Provide documentation by March 10, 2022 that you have solved all PREP questions through the past 2 years (2020,2021). ✓

2. Pass the PICU OSCE case that will be done in January for the 3rd year residents. ✓

3. Pass the NICU OSCE case that will be done in February for the 3rd year residents. ✓

4. Achieve a comparable result to your 3rd year resident colleagues in the Mock Board in March 2022.

**Patient Care:**
1. You need to prepare a lecture about shock and management of shock in patients and present to your colleagues on February 24, 2022.
2. As mentioned above, pass the OSCE case in January and February 2022.
3. Receive favorable evaluations that state you meet your level of training or above from majority of the faculty you work with during the next 3 months.
4. No further serious events involving patients need to occur due to poor documentation, poor follow up or poor communication with the faculty.

**Professionalism:**
1. Receive favorable evaluations from your colleagues.
2. Receive favorable evaluations on professionalism from your faculty.
3. No incidences of anger towards any resident/nurse or patient's family and that includes the use of profane words.
4. You need to follow the rules and regulations as dictated by the program that were written based on the ACGME rules and regulations.
5. During the probation period, you will be fully supervised by all the faculty in all patient encounters, reporting all the history and physical and discussing in detail all the aspects of care related to that patient.
6. You will need to set up a meeting with the CHWR committee to discuss the concerns mentioned in this letter. You also need to set up regular meetings with the EAP to establish a good counseling relationship as you had disclosed issues with concentrating and being able to function for extended periods of time.

On March 24, 2022 the CCC will consider adjusting your probationary status and determine whether to continue your probation or recommend to dismiss you from the Residency Program if the above "Probation Objectives" are not met. Furthermore, during this period of probation and evaluation, occurrence on your part of any unsafe patient practice or unprofessional incidents may result in the recommendation that you be dismissed immediately from this program.

The program is here to assist you in successful completion of your probation. If you have any questions concerning the above objectives or your status in the residency program, please ask me immediately.

Sincerely,

Samer Zaid Kaylani, MD, FAAP
Pediatric Program Director
Associate Professor of Pediatrics

cc:
Kristin Stutz
Janet Abbott
Shannon Herrick, MD

Schyler Zane Grodman
Pediatric Resident

12/17/2021

# Exhibit K



TEXAS TECH UNIVERSITY
## HEALTH SCIENCES CENTER
*at Amarillo*

**CONFIDENTIAL-PEER REVIEW**

December 23, 2021

Schyler Zane Grodman, MD
Department of Pediatrics
TTUHSC School of Medicine
1400 S. Coulter Drive
Amarillo, Texas 79106

Via Hand Delivery

RE:    Notice of Suspension with Pay

Dr. Grodman,

This letter provides you notification that you are hereby placed on suspension with pay, effective immediately. On December 23, 2021, it was found that you violated the terms of your "Probation Objectives" outlined in the letter provided to you on December 17, 2021 and concerns exist that the performance of your duties are seriously compromised or may constitute a danger to patients.

Under TTUHSC House Staff Policies and Procedures, the program may suspend, with pay, a resident when concerns exist that a resident's performance of his/her duties is seriously compromised or may constitute a danger to patients (07.06.01). Suspension with pay is not appealable (07.06.04). The program has 30 days from this notification to conclude an investigation and determine the next course of action.

As part of this suspension, you have been removed from your clinical duties. However, you are to be readily available for phone calls or meetings as needed, and perform duties if, and as, needed.

In accordance with Texas Medical Board rule 171.6, this action will be reported to the Texas Medical Board Licensure Division (07.06.06).

_____                                    12/23/2021
Samer Zaid Kaylani, MD, FAAP                                 Date
Pediatric Program Director
Associate Professor of Pediatrics

_____                                    12/23/2021
Schyler Zane Grodman, MD                                     Date

# Exhibit L

---------- Forwarded message ---------
From: **Grodman, Schyler Z** <Schyler.Z.Grodman@ttuhsc.edu>
Date: Wed, Jan 5, 2022 at 6:24 PM
Subject: Fw: Request for Accommodations
To: Zane Grodman <szaneg@gmail.com>

*Schyler Z. Grodman, MD, MS*

*Resident Physician, 2019-2022*

*Department of Pediatrics*

Texas Tech University Health Sciences Center

1400 South Coulter Street

Amarillo, TX 79106

---

**From:** Grodman, Schyler Z
**Sent:** Wednesday, January 5, 2022 6:23 PM
**To:** Varma, Surendra
**Cc:** Stutz, Kristin; Zaid-Kaylani, Samer
**Subject:** Request for Accommodations

Hello Dr. Varma, hope you are doing well,


I am sending you my completed form to request accommodations from Texas Tech Health Sciences Center. I have attached my request form, and all supporting documentation or prior approved accommodations from previous institutions. I am including Kristin Stutz (regional GME officer) and Dr. Zaid-Kaylani (Pediatric Residency Director in Amarillo, and my direct supervisor) on this email. If there are any issues, please let me know, and I look forward to working with you and the GME office in any way I can.


All the best,

Zane


*Schyler Z. Grodman, MD, MS*

*Resident Physician, 2019-2022*

*Department of Pediatrics*

Texas Tech University Health Sciences Center

1400 South Coulter Street

Amarillo, TX 79106

**Texas Tech University**
**Health Sciences Center**

**CONFIDENTIAL**
All information shared with TTUHSC through the ADA/ADAAA evaluation
and/or reasonable accommodation process will be maintained separate
from personnel files and in accordance with all ADA requirements.

## REASONABLE ACCOMMODATION REQUEST

Individuals who are employed by TTUHSC and are requesting reasonable accommodation(s) under the Americans with Disabilities Act of 1990 (ADA) and ADAAA of 2008 (ADAAA) are encouraged to complete this form in its entirety. If you are unable to complete this form on your own, someone else may complete the form on your behalf. Completed forms are to be returned to your supervisor and a copy to your local Human Resources Office.

**To be completed by Employee:**

Tech ID (R#) R11662133

Request Date 01/03/2022

Name Schyler Zane Grodman

Email Address Schyler.Z.Grodman@ttuhsc.edu

Title Resident Physician

Department Pediatrics

Campus/Location Amarillo

Telephone (201) 707-2829

Supervisor's Name Samer Zaid-Kaylani

Supervisor's Telephone (806) 341-5821

1. **Identify the physical and/or mental impairment(s) for which you are requesting accommodation and the expected duration of the impairment(s). Include the date of diagnosis.**
PLEASE SEE ATTACHED DOCUMENT

2. **Explain how the impairment(s) listed above affect(s) your ability to perform the essential functions of your position according to your job description. If you are a new employee, state the anticipated difficulties you foresee in completing your job duties. Be as specific as possible regarding the job duties you are having difficulty performing or believe you will have difficulty performing. Please attach a copy of your job description.**

PLEASE SEE ATTACHED DOCUMENT

3. **List the accommodation(s) you are requesting in order to perform your essential job functions.**
PLEASE SEE ATTACHED DOCUMENT

*Reasonable Accommodation Request*

4. **Add any comments you believe may be helpful in our consideration of your request.**
   PLEASE SEE ATTACHED DOCUMENT

5. **Medical verification of the impairment(s) (check the appropriate box):**

   ■ I have enclosed the applicable medical documents with this request.

   ☐ The disability and need for a reasonable accommodation is obvious and no medical documentation is needed. Explain.

   **NOTE:** TTUHSC reserves the right to request documentation if the evaluator believes more information is needed to appropriately assess your condition, functional limitations, and/or request for reasonable accommodation.

   _Zane Noordman_                                    _01/04/2022_
   **Employee Signature**                                 **Date**

   _____                            _____
   **Supervisor Signature**                               **Date**

**Instructions:** Forward this request and any accompanying documents, including the employee's position description, to the Office of the AVPHR through your respective Human Resources office.

---

*For HR Use Only*

_____ According to the ADAAA of 2008, the "rules of construction" have been considered during the reasonable accommodation request process.
Initial

☐ Reasonable accommodation request approved. Description of reasonable accommodation to be implemented:

_____

_____

☐ Reasonable accommodation request denied. Reason: _____

_____

_____

Decision letter sent to requestor on: _____ (date) via regular and certified mail.

_____          _____
**HR Designee**                                  **Date Request Completed**

1. **Identify the physical and/or mental impairment(s) for which you are requesting accommodation and the expected duration of the impairment(s). Include the date of diagnosis**.
-ADHD: ongoing duration, diagnosed 1993
-Autism Spectrum Disorder: ongoing duration, diagnosed 1993
-Social Anxiety Disorder: ongoing duration, diagnosed 1993
These diagnosed conditions are long term, and are not expected to fully resolve. However, with proper treatment, these conditions can be managed and controlled.

2. **Explain how the impairment(s) listed above affect(s) your ability to perform the essential functions of your position according to your job description. If you are a new employee, state the anticipated difficulties you foresee in completing your job duties. Be as specific as possible regarding the job duties you are having difficulty performing or believe you will have difficulty performing. Please attach a copy of your job description**.
-  ADHD adversely affects attention to detail and promotes impulsivity, which tends to impair my ability to follow up on details related to patient care, and can lead to unintended interpersonal communication issues. The current medication regimen I have been using has not been able to last the duration of 12-hour shifts, much less 24-hour shifts, with increased lapses in focus towards the end of 12-hour shifts, and at the middle onward of 24-hour shifts. Additionally, because of the above-mentioned impairments, I have been unable to adequately prepare for and complete any in-service training examinations or mock board examinations in the ordinary time allotted.
-Being on the spectrum of Autism has always hindered my interpersonal relationships; for as long as I can remember, I have had difficulty with non-verbal communication, picking up on social cues, and communication which has not been straight-forward. As I have communicated from day one, I do best when clear expectations are laid out, and prompt feedback is given. Often-times, I "think out loud" (i.e., verbalizing a thought process that others without my disorder typically do entirely in their minds), which has often led to confusion; others tend to assume my verbalizations are my conclusions, rather than my way to cogitate (e.g., I tend to verbalize my differential diagnosis process, which is mistaken for a final diagnosis). Additionally, I tend to speak more quickly when under pressure, and at times I mumble. People will often ask me to repeat myself, which leads to frustration on my part for not being able to speak correctly in the first place.

I cannot readily locate an official job description. Elements of my training contract and the house staff policies and procedures, which can be supplied, may inform that question. Also, the following is likely to be instructive: patient care activities within the scope of their clinical privileges commensurate with the level of training, attendance at clinical rounds and seminars, timely completion of medical records, and other responsibilities as assigned or as required of all members of the medical staff. Under the supervision of attending physicians, general responsibilities of the resident physician may include:
--Initial and ongoing assessment of patient's medical, physical, and psychosocial status.
--Perform history and physical.
--Develop assessment and treatment plan.
--Perform rounds.

--Record progress notes.
--Order tests, examinations, medications, and therapies.
--Arrange for discharge and after care.
--Write / dictate admission notes, progress notes, procedure notes, and discharge summaries.
--Provide patient education and counseling covering health status, test results, disease processes, and discharge planning.
--Perform procedures.
--Handle and perform other related and required program duties and responsibilities

3. **List the accommodation(s) you are requesting in order to perform your essential job functions**.
-1.5x extended time on all future in-service training and mock oral examinations, written or oral.
-A separate, isolated location for all future in-service training and mock oral examinations (proctored as in the normal course).
-30 days to meet with and establish local counselling (Dr. Amy Stark), meet with my prior counsellor (Dr. Thomas Brown), and to initiate a new medication regimen and treatment plan.
-An opportunity to collaborate with my program about the components of a remediation plan that are calculated to give me the opportunity to perform at my best, for myself, my patients, and the program.
-Meeting with rotation faculty to receive and review clear, written performance expectations prior to the start of rotations and as needed during rotations.
-Regular, real-time and formative feedback on performance.
-Mentorship (within or without Texas Tech) to assist me with specific performance concerns.
-Any other reasonable thoughts or suggestions from the Texas Tech Pediatrics Residency Program Leadership or the Texas Tech GME
-That time is given for these proposals to be implemented before a final decision is made regarding my standing in the Pediatric Residency Program
I believe these reasonable accommodations will allow me the opportunity to make a positive impact on myself, my patients, and the program.

4. **Add any comments you believe may be helpful in our consideration of your request**.
When I have received accommodations in the past, such as extended time and a separate testing location, not only have I improved, but I have thrived. I was a national merit semi-finalist in high school, and scored on the 99th percentile on the ACT. I was able to complete a double major at the University of Pennsylvania while having a successful athletic career. I was able to succeed in the Columbia Post-Baccalaureate program, making the Dean's List. Finally, in medical school, I was able to complete an additional master's degree along with my medical doctorate, along with doing significant global health work at Columbia. Even going back to the initial evaluations I underwent as a child, I have always had the ability to be successful; it was only a matter to having the right resources and accommodations.

Residency, particularly serving as a senior resident, imposes a higher degree of stress and difficulty than my prior academic and professional pursuits. Under these circumstances, the effects of my impairments are more acutely felt, and thus requires greater accommodation than

I have previously obtained. I am confident that these accommodations can be implemented and still maintain the integrity of the graduate medical education training needed to complete the program. I am dedicated to make this work.

As part of my probation, imposed on December 17, 2021, I was instructed to meet with CHWR and EAP for counseling related to the above-mentioned impairments. I am in the process of pursuing this and appropriate counseling; I have already met with Amy Stark, a local psychiatrist who has agreed to establish ongoing care with me, and I have personally been in contact with the CHWR to arrange a meeting with them. Adequate time is needed to establish this counseling, and implement an appropriate medication regimen. In the event that it is deemed best, it may be necessary to be placed on a short medical leave to attend to these matters before my performance and standing in the program can be appropriately done. Otherwise, my concern is that my ongoing training (including since at least the imposition of probation) does not best ensure that examination and assessment of me accurately reflects my aptitude or achievement level, but rather reflects my impaired skills and aptitudes.

I look forward to collaborating with the program and the university in the forthcoming interactive process.

# Exhibit M

**TEXAS TECH UNIVERSITY**
**HEALTH SCIENCES CENTER**
*at Amarillo*

*Department of Pediatrics*

## CONFIDENTIAL PEER REVIEW

January 7, 2022

**Via Hand Delivery:**
Schyler Zane Grodman, MD
Department of Pediatrics
TTUHSC School of Medicine
1400 S. Coulter Drive
Amarillo, Texas 79106

Re: Notice of Recommendation for Dismissal

Dear Dr. Grodman:

This letter serves notice that as the program director for the Texas Tech University Health Sciences Center Department of Pediatrics Residency Program in Amarillo, with consideration from faculty and the Clinical Competency Committee (CCC), I am recommending that you be dismissed from the Pediatric Residency Program for the reasons outlined below:

> 1. Performance that presents a serious compromise to acceptable standards of patient care despite repeated counseling and close mentoring concerning patient care and management.
> 2. Unprofessional conduct towards your patients and colleagues despite repeated attempts to assist you to improve your interpersonal and communication skills.
> 3. Failure to progress to the expected level of competency as a third-year pediatric resident with serious deficiencies in multiple, ACGME defined, competencies.
> 4. Failure to follow the Probation Objectives outlined in your probation letter that has jeopardized patient welfare.

(See TTUHSC School of Medicine House Staff Policies and Procedures, Section 7.07)

As you know, in March of 2020, you received notice about concerns related to your medical knowledge, professionalism, system-based competency, patient care, practice based learning, and interpersonal skill deficiencies in the pediatric residency program and were placed on observation status. Continued performance issues resulted in you being placed on probation on December 17, 2021. You were provided at that time with specific "Probation Objectives" for improvement. You were advised that your performance, especially in the areas of medical knowledge, patient care, and professionalism would be under close scrutiny and any occurrence on your part of any unsafe patient practice or unprofessional incidents may result in the recommendation that you be dismissed from the pediatric residency program.

During the first week of your probation, you demonstrated multiple incidences of unsafe patient practice and unprofessional behavior. Specifically, you had multiple occurrences where you failed to follow direct orders from the faculty about patient management, failed to monitor patients and address major health concerns, and failed to communicate major related events to your faculty that all created concerns that the

performance of your duties was seriously compromised and constituted a danger to patients. This led to you being placed on suspension, with pay, effective December 23, 2021.

On January 4, 2022, a meeting of the CCC occurred to investigate the events leading up to your suspension and found that your conduct constituted a danger to patients and violated the terms of your probation status. Therefore, in agreement with the CCC, I am recommending to the Dean of the School of Medicine that you be dismissed from the residency program. (See TTUHSC School of Medicine, House Staff Policies and Procedures (HSP&Ps) 07.07 Dismissal.)

At this time, you are still removed from all duties involving patient care pending a final decision by the Dean of the School of Medicine. However, in the meantime, you are to be available for duties which the residency program may assign. Please contact the Program Director directly by phone in advance of entering any of the Department of Pediatrics offices or clinic spaces or any program affiliated hospital.

You may appeal the recommendation for dismissal within five (5) business days of receipt of this notice by submitting in writing a notice of appeal to the Chair of the Graduate Medical Education Committee, Amarillo Campus, Dr. Richard Jordan (See HSP&Ps 07.07.05).

Should you have any questions regarding this action or your rights and responsibilities, please direct those questions to Kristin Stutz, DIO.

Sincerely,

_____          Date: 01/07/2022

Samer Zaid Kaylani, MD, FAAP
Pediatric Residency Program Director
Associate Professor of Pediatrics
TTUHSC-Amarillo

*He "wants to have some one review the letter before he signs it" (SZ)

_____          Date: _____
Schyler Zane Grodman, MD
My signature acknowledges receipt of the above notice

Enclosures:    2021-2022 Graduate Medical Education Program Agreement
               Observation Letter
               Probation Letter
               Suspension with Pay letter
               Disciplinary Action Form
               TTUHSC House Staff Policies and Procedures

cc:
Richard Jordan, M.D., Chair of the Graduate Medical Education Committee, Amarillo Campus (Without enclosures)
Kristin Stutz, Designated Institution Official, Amarillo (without enclosures)
Janet Abbott, Unit Manager, Office of Medical Education, Amarillo (without enclosures)
Shannon Herrick, M.D., Chair of Department of Pediatrics (without enclosures)
Surendra Varma, M.D., Associate Dean for GME and Resident Affairs (without enclosures)

# Exhibit N

## CONFIDENTIAL

### Texas Tech University Health Sciences Center School of Medicine
### Graduate Medical Education

### Disciplinary Action Form

Schyler Zane Grodman PGY 3                    TTUHSC Amarillo/Pediatrics

Name of Resident / PGY Level                    Campus / Department

**TYPE OF INTERVENTION (Circle):**

_____ Observation        _____ Probation        _____ Suspension        **X** Dismissal

**PRIOR INTERVENTION (Circle):** [ ] No        [✓] Yes

If Yes, Observation 03/2020,  Probation 12/2021, Suspension 12/2021

Type of Action / Date(s)

**EFFECTIVE DATES OF ACTION:**

01/07/2022                                                                    ***

Date Intervention to Begin                        Date Intervention to End

### PLEASE ATTACH DOCUMENTATION

**COMMENTS BY PROGRAM DIRECTOR:**

01/07/2022

Program Director                                                            Date

#### ACKNOWLEDGEMENTS AND DATES

_____ 01/07/2022        SK Varma        1/7/22

Department Chair (if different from        Date        Executive Associate Dean for GME and        Date
Program Director or designee)                                Resident Affairs

Richard M. Jordan    1/7/2022        _____    1/7/22

Regional Dean (if applicable)        Date        Office of General Counsel        Date

Kristin A. Stutz    1/7/2022

Campus Designated Institutional Official    Date

* Notification of a Resident completing a period of Observation must be made in writing to the Resident and the GME office.
** Resident placed on Probation, Suspended or Dismissed, must be reported to the TMB within 7 days if the reason is on the list of reasons contained in TMB Rule 171.6 and if final action has been taken.
***Notification of completion of a period of Probation or Suspension must be reported in writing to the GME office as well as the Resident and the TMB, if the TMB was originally notified of the action.

## CONFIDENTIAL