UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

SCHYLER GRODMAN,

      Plaintiff,

v.

TEXAS TECH UNIVERSITY HEALTH
SCIENCES CENTER,

      Defendant.

No. 5:23-CV-210-H

## MEMORANDUM OPINION AND ORDER

Schyler Zane Grodman was a student in the Pediatric Residency Program at Texas Tech University Health Sciences Center. As part of that program, he was required to demonstrate competent patient care and professionalism while progressing towards practice as an independent physician. After several dangerous mistakes that jeopardized the health and safety of his patients, Texas Tech recommended Grodman for termination. He claimed that his shortcomings stemmed from his disabilities, including attention deficit hyperactivity disorder, autism, depression, and social anxiety. But Texas Tech still upheld his termination. Grodman then sued, bringing failure-to-accommodate and retaliation claims under Section 504 of the Rehabilitation Act.

The Court issued a prior Order granting in full Texas Tech's motion for summary judgment (Dkt. No. 44) and denying as moot Texas Tech's *Daubert* motions and the parties' joint motion for a continuance (Dkt. Nos. 42; 43; 58). Dkt. No. 61. The Court now issues this Memorandum Opinion and Order explaining its decisions. In short, Grodman fails to satisfy the threshold element of his failure-to-accommodate claim—that he is a "qualified individual" who can perform the program's essential functions with or without a reasonable

accommodation. Nor can Grodman show that he made a qualifying request for accommodations that was denied or that his disabilities, their resulting limitations, and the necessary reasonable accommodation were open, obvious, and apparent. On Grodman's retaliation claim, he cannot make out the prima facie case, let alone rebut Texas Tech's legitimate, nondiscriminatory justifications for his termination or show that his termination was pretextual. Thus, Texas Tech is entitled to full summary judgment, and the Court need not resolve Texas Tech's objections to Grodman's experts.

1. **Factual and Procedural Background**

   A. **Factual Background**

      i. **Texas Tech's Pediatric Residency Program**

Texas Tech University Health Sciences Center—a state-supported institution that is part of the Texas Tech University System—offers a three-year Pediatric Residency Program. *See* Dkt. No. 45-1 at 443–76. The curriculum is designed to "prepare residents to be competent general pediatricians" who can serve as "leaders in the organization and management of patient care." *Id.* at 445 (emphasis omitted). Along those lines, residents are expected to acquire proficiency in six "competencies," including professionalism, medical knowledge, and interpersonal skills. *Id.* at 371–77, 448. These competencies are tested through regular in-service exams. *Id.* at 447–48.

Residents take on more responsibility during each year of the program. *See id.* at 450–54. By the third year of training (PL3), residents assume a "supervisory role." *Id.* at 454. PL3s must be able to "function as an independent clinician," meaning they can "manage simple to complex problems" and "directly assess day-to-day patient care." *Id.* at 106, 347, 454. If a PL3 cannot independently practice medicine (or satisfy any of several

other requirements, like demonstrating satisfactory communication skills), then he or she does not meet the criteria to graduate from the program. *See id.* at 455.

Each resident is evaluated twice per year by the Clinical Competency Committee (CCC)—a group of faculty members who, along with the Program Director, assess a resident's progress toward certain milestones. *Id.* at 389, 448. In making recommendations concerning remedial work, contract renewal, and promotion, the CCC looks to various materials, including evaluations from a resident's attending physician, in-service exam scores, and procedure logs. *Id.* at 448. Final decisions on the CCC's recommendations lie with the Program Director. *Id.*

### ii.    Grodman's Disabilities and Early Residency

When he was a child, Schyler Zane Grodman was diagnosed with attention deficit hyperactivity disorder (ADHD), autism, depression, and social anxiety. Dkt. No. 51 at 7 ¶¶ 3, 4. These ongoing conditions substantially limit Grodman's major life activities. *Id.* For example, because of his ADHD, Grodman struggles with "managing small details and accomplishing tasks in the allotted amount of time." *Id.*

Despite these challenges, Grodman obtained his undergraduate and medical degrees from Ivy League institutions. *Id.* at 8 ¶ 5. He received accommodations throughout his schooling, including extra time on standardized tests and licensing exams. *Id.*

Grodman's academic career continued in July 2019 when he began his pediatric residency at Texas Tech's Amarillo campus. *Id.* As a resident, Grodman coordinated patient care and participated in "all aspects of pediatric patient treatment." *Id.*

Upon joining the program, Grodman began working closely with Dr. Samer Zaid-Kaylani, the program's now-former director. *See* Dkt. No. 45-1 at 47–48, 54. According to

Grodman, he disclosed his disabilities to multiple faculty members—including Dr. Kaylani—during his first year with the program. *Id.* at 5; Dkt. No. 51 at 8. The evidence on that front is mixed. Grodman's mentor, Dr. Shannon Herrick, testified that Grodman told her about his ADHD during his first year. Dkt. No. 45-1 at 283, 285. Grodman also alluded to concerns that "he had autism when he was little," but that "he no longer had it." *Id.* at 285. Dr. Angela Huang, a professor who supervised Grodman during a clinical rotation, recalled Grodman sharing that he has autism and ADHD. Dkt. No. 51 at 550–51. Dr. Kaylani, for his part, has a different recollection. He maintains that Grodman did not disclose his ADHD until his third year, long after reporting that he had "outgrown" his autism as a child. Dkt. No. 45-1 at 54–55, 103.

Still, it is undisputed that Texas Tech made some informal accommodations for Grodman's disabilities during his early years in the program. *Compare* Dkt. No. 50 at 15 (Grodman claiming that Texas Tech "provided informal accommodations, indicating its awareness of [his] disabilities and needs"), *with* Dkt. No. 45 at 24 (Texas Tech noting that the "undisputed record shows that [the program] was providing 'accommodations'— feedback, mentorship, oversight, supervision[,] etc.—to assist [Grodman] in performing his job duties"). For instance, Dr. Kaylani gave Grodman double time on exams administered by the program. Dkt. No. 45-1 at 104. And Dr. Kaylani approved that accommodation despite apparently telling Grodman that the program's exams were for "educational purposes only" and that the scores would never be used against him. Dkt. No. 51 at 8 ¶ 11.

Even with the informal accommodations, Grodman's early performance in the program was hit or miss. At times, Grodman was successful. He was twice promoted, and faculty members wrote him positive recommendations for fellowship programs. *Id.* at 9

¶ 13, 73–75.  But he also struggled.  In his first year, Grodman was placed on observation because of concerns about his "medical knowledge, professionalism competency, system based competency, patient care, practice based learning, and interpersonal skill[s]."  *Id.* at 32–34.  Grodman completed all remedial measures, however, and the CCC later removed him from observation, albeit with close monitoring.  *Id.* at 39; Dkt. No. 45-1 at 136.

Grodman's second-year performance was also inconsistent.  Evaluations from faculty members show some improvement.  *See* Dkt. No. 45-1 at 129–35.  One supervisor, for example, applauded Grodman's support for a family with a child in hospice care.  *Id.* at 130–31.  But most assessments were less complimentary.  An attending physician, describing Grodman's patient-management practices, warned of "a medicolegal disaster waiting to happen."  *Id.* at 133.  And another resident emailed Dr. Kaylani to report Grodman's apparent disdain for chronically ill children, who he reportedly called "headache[s]."  *Id.* at 139.  Throughout this period, Dr. Kaylani and other faculty members assisted Grodman with getting professional counseling, all while he accounted for 40% of patient and nursing complaints.  *Id.* at 126–27, 141.  Still, the CCC promoted Grodman to the third and final year of the program.  *See id.* at 599.

### iii.    Grodman's Final Year of Residency

Grodman's final year got off to a rocky start.  After returning to Amarillo from a summer rotation in Dallas, Grodman tore his Achilles tendon playing soccer.  Dkt. No. 51 at 201.  He claims that he was "not offered or provided any formal plan of remediation or support" after his injury.  *Id.* at 9 ¶ 16.  Text messages from Dr. Kaylani and Dr. Herrick rebut this account.  Both told Grodman that they were available if he needed "[a]nything at all" after surgery; Dr. Kaylani offered to arrange transportation to get Grodman home from

the hospital, if needed.  *Id.* at 345–46.  Dr. Kaylani also modified Grodman's schedule to aid in his recovery, which included several months of physical therapy.  *Id.* at 76.

During this period, Grodman applied for post-residency fellowship programs.  *Id.* at 201–02.  He interviewed nine times but was ultimately unsuccessful.  *Id.*  The all-consuming stress from the fellowship search, combined with the physical challenges from the Achilles injury, admittedly "impact[ed] [Grodman's] ability to perform."  *Id.* at 9.

The problems came to a head on December 4, 2021.  *See* Dkt. No. 45-1 at 77.  That evening, Grodman made several errors while on call.  *See* Dkt. No. 51 at 77–79.  First, Grodman did not follow Dr. Kaylani's instructions and failed to order fluids and antibiotics for a "very sick" child.  *Id.* at 78.  It was not until a second-year resident identified Grodman's mistake that Dr. Kaylani returned to the hospital and found the child in shock.  *Id.*  The child was immediately moved to the pediatric intensive care unit, where she received multiple urgent transfusions.  *Id.*

During the same shift, Grodman failed to reevaluate a different patient who was admitted with severe dehydration.  *Id.* at 78–79.  Grodman limited another child to "maintenance only," even though the child was vomiting bile and had a possible intestinal obstruction.  *Id.* at 79.  According to Dr. Kaylani, these incidents were not unusual.  In the weeks leading up to the December 4 shift, Grodman entered seizure medication for a child that was four times greater than his prescribed dose.  (A nurse later caught the mistake and prevented the medication from being refilled.)  *Id.*  And before that, Grodman tried to forcefully retract a two-week-old baby's foreskin over the mother's repeated objections.  *Id.*  These incidents led Dr. Kaylani to label Grodman a "dangerous resident."  *Id.*

### iv.    Texas Tech's Disciplinary Actions Against Grodman

The next day, Dr. Kaylani called for the CCC to hold an urgent vote to place Grodman on immediate probation with "possible eventual decision for termination." *Id.* at 81–83.  The committee agreed, noting the program's repeated efforts to accommodate Grodman, his lack of improvement, and the committee's general concerns about the safety of Texas Tech's patients.  *See id.* at 77, 84.  Here is how one faculty member described his thinking: "Whether [Grodman's failings are] due to a medical issue, psychiatric issue, or severe personality deficit, I don't know and honestly don't care at this stage."  *Id.* at 84.  Grodman was such a "poison pill," the faculty member continued, that he would diminish fellowship prospects for other Texas Tech residents.  *Id.*  Grodman maintains that he was unaware of these discussions at the time.  *Id.* at 9 ¶ 18.

A few days later, on December 10, Grodman met with Dr. Kaylani to discuss his performance.  *See, e.g.*, *id.* at 9 ¶ 19; Dkt. No. 45-1 at 83–84.  According to Grodman, this meeting was "incredibly hostile."  Dkt. No. 45-1 at 12.  Dr. Kaylani accused Grodman of "having senioritis," and when Grodman said that he was adjusting his ADHD medication, Dr. Kaylani asserted that he was "a doctor who doesn't believe in medicine."  Dkt. No. 51 at 300.  At his deposition, Dr. Kaylani admitted that he "raise[d] [his] voice" during the meeting.  Dkt. No. 45-1 at 85.  But he only did so after Grodman apparently said that he did not "want those poisons in [his] body," nor did he "want people to be telling [him] what to do" in counseling.  *Id.*  Dr. Kaylani testified that these statements were the final straw; after the December 10 meeting, he began making formal arrangements to put Grodman on probation.  *Id.* at 84–85.  Again, and despite Dr. Kaylani's claims to the contrary, Grodman

contends that he was unaware at this point that disciplinary actions were under consideration.  *Id.* at 89–90; Dkt. No. 51 at 9 ¶ 19.

A week later, on December 17, Grodman was notified via letter that he had been placed on probation.  Dkt. No. 51 at 88.  The letter explained that probation was necessary because of, among other things:

> [Grodman's] failure to adequately remediate areas of academic deficiencies noted in prior corrective action plans; failure to meet the objectives expected for a third-year resident; [his] performance presents a serious comprise [sic] to acceptable standards of patient care; . . . fail[ure] to progress satisfactorily in fund [sic] knowledge, skill acquisition[,] and professional development; and [his] unprofessional conduct.

*Id.*  Regarding patient care, the letter described multiple "major red flags"—including the December 4 episodes—that "could have placed the patients in real morbid situations."  *Id.* It also gave a list of "Probation Objectives," which listed areas and ways that Grodman could improve over the three-month probationary period.  *Id.* at 89–90.  Lastly, the letter noted that, "during this period of probation and evaluation," "any unsafe patient practice or unprofessional incidents may result in the recommendation that [he] be dismissed immediately from [the] program."  *Id.* at 90.

Despite this notice, Grodman continued to display questionable judgment.  Just five days after being placed on probation, Grodman failed to order antibiotics for an infant admitted with fever, bronchiolitis, and vomiting.  Dkt. No. 45-1 at 433.  He also placed orders on the wrong patient (though he later recognized the mistake) and would only leave the resident sign-out room when asked a question.  *Id.* at 434.

Following these incidents, Grodman was suspended on December 23.  Dkt. No. 51 at 91.  According to the suspension letter, Grodman was found to have "violated the terms of [his] 'Probation Objectives' outlined in the letter provided to [him] on December 17."  *Id.*

– 8 –

The letter further stated that "concerns exist that the performance of [his] duties are seriously compromised or may constitute a danger to patients." *Id.* The program planned to investigate the matter within 30 days and then determine how to proceed. *Id.*

During this period, Grodman sent a letter to the CCC, dated December 27, 2021, wherein he admitted that he "should have requested accommodations for [his] disability." *Id.* at 95. The letter goes on to describe what Grodman viewed as the roots of his problems, including insufficient medication to address his ADHD and related anxiety. *Id.*

Notwithstanding Grodman's pleas for leniency, the CCC unanimously voted to recommend his termination on January 4, 2022. *See* Dkt. No. 45-1 at 158–61. Around the same time, Grodman submitted his first formal request for accommodations. Dkt. No. 51 at 100–04. His application identified his disabilities and explained how those impairments adversely affected his performance as a resident. *Id.* at 102. As for specific accommodations, Grodman requested extra time on exams, opportunities to see a counselor, and personalized support to address "specific performance concerns." *Id.* at 103. The CCC did not learn of the request until, at the earliest, January 5, the day after it voted to recommend Grodman's termination. *Id.* at 110–11; *see* Dkt. No. 45-1 at 170.

On January 7, Grodman received from Dr. Kaylani a formal notice of recommendation for dismissal. Dkt. No. 51 at 113–14. The letter outlined Grodman's repeated clinical failures throughout his time in the program, including his inability to satisfy his specific "Probation Objectives" for improvement. *Id.* at 113. Dr. Kaylani explained that the CCC investigated the events leading up to Grodman's suspension and, at the January 4 meeting, "found that [his] conduct constituted a danger to patients and violated the terms of [his] probation status." *Id.* at 114. The CCC therefore recommended

to the Dean of the School of Medicine that Grodman be dismissed from the program and that he be removed from all duties involving patient care pending a final decision. *Id.*

Grodman appealed the termination internally. *See id.* at 199–230. The program's review board recommended approving the dismissal. *Id.* at 237. On February 24, the Dean issued a formal notice terminating Grodman from the program. *Id.* at 238.

### B.   Procedural Background

Sometime after these events, Grodman filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC). *Id.* at 239–49; *see Smith v. Potter*, 400 F. App'x 806, 811 (5th Cir. 2010) (noting the administrative exhaustion requirements for Rehabilitation Act claims). The EEOC later issued Grodman a right-to-sue letter informing him that it would not proceed with its investigation. Dkt. No. 21 at 34.

Within 90 days of receiving the EEOC's letter, Grodman filed this lawsuit against Texas Tech alleging violations of the Americans with Disabilities Act (ADA), the Texas Commission on Human Rights Act (THCRA), and the Rehabilitation Act. *See* Dkt. No. 1. The Rehabilitation Act claims were premised on two theories of liability: failure to accommodate and retaliation. *Id.* ¶ 75.

Texas Tech moved to dismiss the ADA and THCRA claims as barred under the Eleventh Amendment. Dkt. No. 5. Grodman tried to amend his complaint, but the Court struck the amended complaint for failure to comply with Federal Rule of Civil Procedure 15(a). Dkt. Nos. 10; 13.

Soon after, Grodman moved for leave to file his amended complaint. Dkt. No. 14. The Court granted his motion over Texas Tech's objection and denied the original motion to dismiss as moot. Dkt. Nos. 16; 19; 20. Grodman's amended complaint added

Dr. Kaylani as a defendant, dropped the ADA and THCRA claims, and asserted a new procedural due process claim against both defendants under 42 U.S.C. § 1983. *Compare* Dkt. No. 21, *with* Dkt. No. 1. Each defendant moved to dismiss the amended complaint. *See* Dkt. Nos. 22; 23. The Court stayed discovery while the motions were pending because each defendant raised an immunity defense. Dkt. Nos. 22 at 8; 23 at 3; 30.

The Court granted in part and denied in part Texas Tech's motion to dismiss. *See* Dkt. No. 33. The Court dismissed the procedural due process claim because Texas Tech is immune from suit under Section 1983. *Id.* at 11–13 (citing *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 n.3 (5th Cir. 1996)). Even so, the Court determined that Grodman pled a viable failure-to-accommodate claim under the Rehabilitation Act. *Id.* at 16–21. And because Texas Tech did not move to dismiss Grodman's retaliation claim, the Court allowed the case to proceed on that claim, too. *Id.* at 16 & n.10. Lastly, the Court dismissed the procedural due process claim against Dr. Kaylani—this time for lack of standing—because Dr. Kaylani could no longer provide Grodman relief as he was no longer the Program Director. *Id.* at 13–16.

After resolving the motions to dismiss, the Court lifted the discovery stay. Dkt. No. 37 at 12. A year later, Texas Tech moved for summary judgment on the two remaining Rehabilitation Act claims. Dkt. No. 44. It also moved to exclude the expert testimony of Gregory Care—a lawyer who represents doctors in disciplinary proceedings—and Stephen Nicholas—an admissions official at Columbia University's medical school. Dkt. Nos. 42–43; 46 at 2; 47 at 1. Grodman responded to all three motions (Dkt. Nos. 50; 52; 53), and Texas Tech replied (Dkt. Nos. 55–57).

2.    **Legal Standard**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists if a reasonable jury could enter a verdict for the non-moving party."  *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020).  The moving party "bears the initial responsibility of demonstrating the absence of a genuine issue of material fact," *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (internal omission and alteration omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)), and "identifying those portions of [the record] which it believes demonstrate [that] absence."  *Celotex Corp.*, 477 U.S. at 323.

In evaluating a summary-judgment motion, the Court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018).  However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  "A fact 'is material if its resolution could affect the outcome of the action.'"  *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020) (quoting *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 134 (5th Cir. 2010)).  The Court must consider materials cited by the parties, but it may also consider other materials in the record.  Fed. R. Civ. P. 56(c)(3).

"Where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact

warranting trial." *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 301–02 (5th Cir. 2020) (quoting *In re La. Crawfish Producers*, 852 F.3d 456, 462 (5th Cir. 2017)). The movant, however, does not need to "*negate* the elements of the nonmovant's case." *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017) (emphasis in original) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)). "If the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

When the moving party has met its burden, "the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). Rather, the nonmovant must identify specific evidence in the record and articulate how the evidence supports its claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014); *see also* Fed. R. Civ. P. 56(c)(1)(A). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little*, 37 F.3d at 1075). Additionally, Rule 56 does not impose a duty on the Court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).

"A failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164

(5th Cir. 2006). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted. *Celotex Corp.*, 477 U.S. at 322–23. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

## 3.    Analysis

The Rehabilitation Act of 1973 sets out "a comprehensive federal program" to protect the rights of Americans with disabilities. *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 626 (1984); *see* Pub. L. No. 93-112, 87 Stat. 355. To that end, Section 504 of the Act prohibits federally funded programs from discriminating based on disability. Similar to Title II of the ADA, Section 504 provides that no "otherwise qualified" individual with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[1] 29 U.S.C. § 794(a). Texas Tech, as a recipient of federal funds, must comply with Section 504's guarantees. *See* Dkt. No. 35 ¶ 65; *Miller v. Tex. Tech Univ. Health Scis. Ctr.*, 421 F.3d 342, 348–50 (5th Cir. 2005) (en banc) (holding that Texas Tech waived immunity from suit under Section 504 by accepting federal funds).

---

[1] Title II of the ADA extends the Rehabilitation Act's requirements to public entities that may not receive federal funding, including private employers. *See* 42 U.S.C. § 12131(1). The only "material difference" between Section 504 and Title II is their "respective causation requirements." *J.W. v. Paley*, 81 F.4th 440, 449 (5th Cir. 2023) (quotation omitted). Under Section 504, a plaintiff's disability must be the "sole reason" for the discrimination; Title II's standard is less rigorous. *Id.*; *see* 29 U.S.C. § 794(a). Otherwise, given the similarities between the statutes, case law interpreting either statute applies to both. *Delano-Pyle v. Victoria County*, 302 F.3d 567, 574 (5th Cir. 2002).

Section 504 is enforceable through an implied private right of action. *Frame v. City of Arlington*, 657 F.3d 215, 224 (5th Cir. 2011) (en banc). To prevail under Section 504, a plaintiff must show that he was (1) an "individual with a disability"; (2) "otherwise qualified" for the program; and (3) excluded from, denied the benefits of, or otherwise subjected to discrimination under the program "solely by reason of her or his disability." *See Hileman v. City of Dallas*, 115 F.3d 352, 353 (5th Cir. 1997) (quoting § 794(a)).

Along with prohibiting outright discrimination, the "Rehabilitation Act impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 & n.11 (5th Cir. 2005); *see Tennessee v. Lane*, 541 U.S. 509, 531 (2004) (observing that "failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion"). That obligation comes from Section 504's implementing regulations, which require federal funding recipients to "make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee," unless it would pose an "undue hardship" for the recipient's program or activity. 28 C.F.R. § 42.511(a). Reasonable accommodations may include, among other things, "job restructuring" and "part-time or modified work schedules." *Id.* § 42.511(b).

Grodman also brings a distinct claim for retaliation. Although Section 504 does not specifically refer to retaliation, the Fifth Circuit permits such claims based on regulations that bar "retaliation for opposing any practice made unlawful by . . . the Rehabilitation Act." *Shannon v. Henderson*, No. 01-10346, 2001 WL 1223633, at *3 (5th Cir. Sept. 25, 2001) (omission in original) (quoting 29 C.F.R. § 1614.101 (2000)). Moreover, the Rehabilitation Act provides that the standards for employment discrimination under Section

– 15 –

504 are the same as those under the ADA, which expressly prohibits retaliation for protected conduct. *See* 29 U.S.C. § 794(d); 42 U.S.C. § 12203(a). Because retaliation is prohibited against "any individual, whether handicapped or not," 28 C.F.R. § 42.503(b)(1)(vii), a plaintiff may maintain a retaliation claim regardless of whether he can prove disability discrimination. *See D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 40–41 (1st Cir. 2012).

The Court address each claim in turn.

### A.    Failure to Accommodate

To prevail on a failure-to-accommodate claim under the Rehabilitation Act, a plaintiff must prove: "(1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015). The law "does not require clairvoyance." *Windham v. Harris County*, 875 F.3d 229, 236 (5th Cir. 2017) (quotation omitted). As such, "the burden falls on the plaintiff 'to specifically identify the disability and resulting limitations,' and to request an accommodation in 'direct and specific' terms." *Id.* at 237 (first quoting *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996); then quoting *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001)). An employee's timely accommodation request "triggers the employer's obligation to participate in [an] interactive process" to identify an appropriate accommodation. *Cutrera v. Bd. of Sup'rs of La. State Univ.*, 429 F.3d 108, 112 (5th Cir. 2005).

When a plaintiff fails to timely request an accommodation, "he can prevail only by showing that 'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents." *Windham*, 875 F.3d at

237 (quoting *Taylor*, 93 F.3d at 164).  The "open, obvious, and apparent" standard is a "narrow exception" to the default rule that "'[i]f the [plaintiff] fails to request an accommodation, the [public entity] cannot be held liable for failing to provide one.'"  *Id.* at 239 (quoting *Taylor*, 93 F.3d at 165) (alterations in original).  Put differently, where the limitations and necessary accommodations for a disability are uniquely within an employee's knowledge, it is not the employer's duty to identify and suggest an appropriate accommodation.  *See Taylor*, 93 F.3d at 165.

### i.    Grodman was not a "qualified individual."

Because there is no genuine factual dispute that Grodman could not independently practice medicine with or without a reasonable accommodation, he was not "qualified" to continue as a resident in the program.  *See Ball*, 792 F.3d at 596 n.9.  That conclusion alone resolves Grodman's failure-to-accommodate claim.

The "qualified individual" requirement recognizes that an employer is not wedded to a disabled employee who cannot satisfy basic job requirements.  *See Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 405 (1979).  As the Fifth Circuit recently explained, a "'qualified individual' under the Rehabilitation Act 'means an individual who, with or without reasonable accommodation, can perform the essential functions of' [his] position."  *Harmon v. Collier*, 158 F.4th 595, 609 (5th Cir. 2025) (quoting 42 U.S.C. § 12111(8)).  Under the statute, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."  *Id.* (quoting § 12111(8)).  Texas Tech maintains that

Grodman was not "qualified" to continue as a resident because he "indisputably" failed to provide safe, independent patient care.  Dkt. No. 45 at 26.

Before turning to the evidence, the Court must define the "essential functions" of Grodman's position.  As a third-year resident, Grodman was expected to "[a]ssume a supervisory role" and "function as an independent clinician."  Dkt. No. 45-1 at 454. Independent practice "includes the ability to manage simple to complex problems as well as directly assess day-to-day patient care."  *Id.*  No doubt, independent practice is an "essential" function for a program designed to produce "competent general pediatricians" who can serve as "leaders in the organization and management of patient care."  *Id.* at 445 (emphasis omitted); *see Shaikh v. Tex. A&M Univ. Coll. of Med.*, 739 F. App'x 215, 220 (5th Cir. 2018) ("A requirement is 'essential' if 'the nature of the program would be fundamentally altered' without it." (quoting *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 158 (2d Cir. 2013))).  In fact, no resident may complete the program without demonstrating proficiency in independent patient care.  *See* Dkt. No. 45-1 at 455.

Against this backdrop, there is no genuine dispute of material fact that Grodman was incapable of practicing medicine independently.  The record is chock-full of situations in which Grodman failed to safely diagnose and treat pediatric patients.  *See, e.g.*, Dkt. Nos. 45-1 at 433–34; 51 at 77–79.  The December 4 episode is just one example.  Recall that Grodman failed to order fluids for a "very sick" child despite Dr. Kaylani's instructions—an error that was eventually caught by a less-experienced resident and which required moving the child to the intensive care unit.  Dkt. No. 51 at 78.  On other occasions, Grodman entered the wrong seizure medication for a patient and forcefully retracted the foreskin of another without the mother's consent.  *Id.* at 79.  Grodman accepted "full responsibility" for

– 18 –

his clinical errors, labeling at least one as an "honest mistake" and others as "failure[s] to follow up." *Id.* at 97. So, by Grodman's own admission, he failed to provide safe and independent clinical care. That is, he did not satisfy the program's "essential functions."

There is no evidence that an accommodation in the clinical setting would have allowed Grodman to safely practice medicine independently. *See McGregor v. La. State Univ. Bd. of Sup'rs*, 3 F.3d 850, 855 (5th Cir. 1993) (explaining that a student may still be "qualified" if they complete academic requirements "with the aid of reasonable accommodations"). If anything, the record reflects Grodman's desire for even greater oversight, feedback, supervision, and mentorship—all of which Texas Tech already provided in abundance. *See* Dkt. Nos. 45-1 at 110–11, 153–56; 51 at 229 (Grodman explaining that he "would benefit" from personalized meetings before and during rotations, along with mentorship and "regular, real-time and formative feedback on [his] performance"). That Grodman continued to make potentially deadly mistakes despite regular oversight underscores his inability to perform the program's "essential functions."

Besides, it would not be a "reasonable" accommodation to give Grodman additional oversight in the clinical environment. *See McGregor*, 3 F.3d at 855. Again, the point of the program is to develop physicians who can render independent care; the program's graduates are themselves supposed to be "leaders" in patient management. Dkt. No. 45-1 at 445. An accommodation that provides Grodman with additional supervision—or that gives him time off to seek counseling and adjust his medication (*see* Dkt. No. 51 at 103)—does not advance those programmatic goals. *See Fuller v. Frank*, 916 F.2d 558, 562 (9th Cir. 1990) (reasonable accommodation does not necessarily include awaiting the results of uncertain treatment). As the Supreme Court has made clear, Section 504 does not "compel

– 19 –

educational institutions" like Texas Tech "to make substantial modifications in their programs to allow disabled persons to participate." *Se. Cmty. Coll.*, 442 U.S. at 405; *see Alexander v. Choate*, 469 U.S. 287, 300–01 (1985) (same). Demanding an accommodation that undercuts Grodman's ability to independently practice medicine would do just that.

Lastly, there is no dispute that Grodman's conduct posed a "safety risk" to his patients. *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996). That too renders him "unqualified" under Fifth Circuit precedent. *Id.* The Fifth Circuit has reiterated that the law "does not require an employer to accommodate an individual if the employee would pose a direct threat to the health and safety of others." *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 296 (5th Cir. 1998) (citing 42 U.S.C. § 12113(b)). Given the abundant evidence of Grodman's dangerous mistakes, "any accommodations in this case would be unjustified from the standpoint of the basic medical safety of [his] patients." *Id.* Put another way, there is no genuine factual dispute that Grodman was "unqualified." He could not meet the program's most basic requirements—providing safe and independent medical care—even with a reasonable accommodation.

Grodman's rebuttal is unpersuasive. *See* Dkt. No. 50 at 25–26. He highlights his impressive educational background, as well as some indications that he showed gradual improvement during his first two years in the program. *Id.* Those metrics are beside the point. Although Grodman made some progress in his early residency, it does not follow that he satisfied the program's essential functions during his third and final year, which entailed greater responsibility and expectations. *See* Dkt. No. 45-1 at 454–55. Plus, academic degrees do not necessarily make someone "qualified" under the Rehabilitation Act. The question is whether they can perform the essential functions of their position with

or without a reasonable accommodation. *See Harmon*, 158 F.4th at 609. On this record,

there is no genuine dispute that Grodman failed to meet that bar.

> ### ii. Grodman did not make a qualifying request for accommodations that was denied.

Apart from the "qualified individual" analysis, there is no genuine dispute of

material fact that (1) Grodman's formal request for accommodations in January 2022 was

untimely, and (2) that while Grodman made earlier requests for extra time on in-service

exams, those requests were not denied.

Again, it is the employee's burden "to request an accommodation in 'direct and

specific' terms." *Windham*, 875 F.3d at 237 (quoting *Reed*, 244 F.3d at 261). The employee

must "specifically identify the disability and resulting limitations." *Patton v. Jacobs Eng'g

Grp., Inc.*, 874 F.3d 437, 444 (5th Cir. 2017) (quoting *EEOC v. Chevron Phillips Chem. Co., LP*,

570 F.3d 606, 621 (5th Cir. 2009)). "Although the employee need not utter any magic

words, [he] 'must explain that the adjustment in working conditions or duties [he] is seeking

is for a medical condition-related reason." *Id.* (quoting *Chevron Phillips*, 570 F.3d at 621).

Grodman did not formally request accommodations until January 4, 2022[2]—the

same day that the CCC voted to recommend his termination to the Dean based on his

deficient patient care. Dkt. Nos. 45-1 at 158–61; 51 at 101. It is undisputed that the CCC

did not learn of the request until the next day. Dkt. No. 51 at 110–11; *see* Dkt. No. 45-1 at

170. At that point, Grodman's formal request for accommodations was "too little, too

late." *Reed*, 244 F.3d at 262 n.9. In situations like this one, where termination based on a

"legitimate, nondiscriminatory reason" like the failure to provide safe patient care "has been

---

[2] The form lists January 3 as the date of the request. Dkt. No. 51 at 100. However, Grodman did not sign the form until January 4. *Id.* at 101.

made effective but has not yet been processed, courts must not permit the employee to use
the [law] as a shield from being fired by suddenly requesting an accommodation before the
ink on [his] valid termination papers is dry." *Green v. Medco Health Sols. of Tex., LLC*, 947
F. Supp. 2d 712, 729 (N.D. Tex. 2013), *aff'd*, 560 F. App'x 398 (5th Cir. 2014).  Grodman
had over two years to formally request accommodations through the program.  He failed to
do so.  Then, once termination became a possibility, Grodman admitted that he "should
have requested accommodations for [his] disability."  Dkt. No. 51 at 95.  Therefore,
Grodman's belated formal request did not "trigger[] [Texas Tech's] obligation" to help
identify an appropriate accommodation.  *Cutrera*, 429 F.3d at 112.

It is less clear whether Grodman's earlier appeals for extra time on in-service exams
constitute timely requests for accommodations and, if so, whether those requests were
denied.  In his declaration, Grodman maintains that he requested extra time on the exams.
Dkt. No. 51 at 8 ¶ 10.  Dr. Kaylani apparently told Grodman that the program's
examinations were for "educational purposes only" and that the scores would never be used
against him.  *Id.* ¶ 11.  Even so, the letter placing Grodman on probation identified his low
test scores as a "major issue[] of concern."  *Id.* at 88; *see id.* at 113–14 (termination letter
noting the deficiencies in "medical knowledge" that led to Grodman's probation); *see also*
Dkt. No. 33 at 19 (Court's order denying Texas Tech's motion to dismiss because Grodman
did not allege a "harmless denial of an accommodation").  Thus, as Grodman's argument
goes, Texas Tech refused his request for extra time on in-service exams and then used his
poor performance on those same exams as a reason for his termination.  Dkt. No. 50 at 22.

This argument is not supported by the record.  Dr. Kaylani testified at his deposition
that he did in fact give Grodman double the amount of time on exams administered by

Texas Tech. Dkt. No. 45-1 at 104; *see id.* at 100. Grodman does not point to evidence

rebutting this testimony. His own declaration (in which Grodman claims that Dr. Kaylani

downplayed the importance of the in-service exams) does not contend that any request for

extra time was actually denied. Dkt. No. 51 at 8 ¶ 11. And, in any event, Grodman's

termination letter focuses on his deficient patient care, not his exam performance.[3] *See id.* at

113–14. In the end, Grodman's assertion that "Texas Tech denied [his] request for extra

time on exams" rings hollow. Dkt. No. 50 at 22.

Viewed most charitably, Grodman may be referring to in-service exams administered

by the American Board of Pediatrics (ABP), not Texas Tech. *See id.* at 23. It does not

appear that Grodman received extra time on those exams. *See id.* But here too Grodman's

case stumbles. The ABP oversees accommodation requests for its exams; the residency

location is not responsible for approving accommodations. Dkt. No. 45-1 at 105, 417–21.

In an email exchange, Dr. Kaylani offered to assist Grodman with applying for

accommodations through the ABP, and he specifically asked Grodman to provide the

program with the necessary documents. Dkt. No. 51 at 53. Grodman never provided the

documentation to support his request for accommodations. Dkt. No. 45-1 at 105. "Where

an employee refuses to provide such documentation, [the Fifth Circuit has] held that he

---

[3] Relatedly, Texas Tech argues that Grodman lacks standing to advance his failure-to-accommodate
claim based on the program's purported failure to provide him extra time on exams. Dkt. No. 45
at 24–25. As Texas Tech frames the issue, because Grodman's termination was based on his
deficient patient care, "he cannot demonstrate any injury fairly traceable to [the program's] alleged
failure to provide him extra time to complete any exam." *Id.* at 24; *see also Baker v. Univ. of Tex.
Health Sci. Ctr. Hous.*, No. H-08-1908, 2011 WL 1549263, at *4 (S.D. Tex. Apr. 21, 2011) ("[T]he
plaintiff is obligated to show, by competent evidence, that the defendants' violation of [Section
504] proximately caused [his] actual injury before [he] can recover."). The Court does not reach
this issue—both because there is no genuine factual dispute as to whether Grodman was a
"qualified individual," and because Grodman has offered no evidence to rebut Texas Tech's
showing that the program did provide him with extra time on exams that it administered.

causes a breakdown in the interactive process that may preclude an employer's liability." *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 482 (5th Cir. 2016). There is a reason why the process is "interactive"—it requires the input of the employee as well as the employer. *Loulseged v. Azko Nobel Inc.*, 178 F.3d 731, 735–36 (5th Cir. 1999). And when a breakdown in the process "is traceable to the employee," *id.*, the employer cannot be found to have violated the law. *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 224 (5th Cir. 2011). So, to the extent that Grodman premises his failure-to-accommodate claim on his inability to obtain extra time for the ABP testing, that result is not attributable to Texas Tech.

In sum, there is no genuine and material factual dispute about whether Grodman timely requested accommodations from the program. Grodman's formal request for accommodations was too late, and to the extent he sought accommodations on in-service exams, those requests were either not refused or could only be granted by the ABP.

### iii.    The "open, obvious, and apparent" exception did not apply.

Having failed to timely request a reasonable accommodation, Grodman can prevail only if he satisfies the "open, obvious, and apparent" exception. As noted, this "narrow exception" is limited to those situations where the employer clearly would have known of the employee's "disabilities, limitations, and necessary accommodations" absent any notification from the employee. *Windham*, 875 F.3d at 239. The Fifth Circuit has explained that, "'[w]hen dealing in the amorphous world of mental disability,' it will often be impossible for an employer to identify an employee's specific disabilities, limitations, and possible accommodations." *Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 633 F. App'x 214, 216 (5th Cir. 2015) (alternation in original) (quoting *Taylor*, 93 F.3d at 165). "To prevail, [a plaintiff] must adduce evidence that all three were or should have been

– 24 –

obvious." *Windham*, 875 F.3d at 238 (quoting *Taylor*, 93 F.3d at 165). Grodman fails to make that showing.

Here, there is a fact dispute about whether the program was aware of Grodman's disabilities early in his tenure. Grodman maintains that he disclosed his disabilities during his first year. Dkt. Nos. 45-1 at 5; 51 at 8 ¶ 9. Dr. Herrick corroborated that account (Dkt. No. 45-1 at 283, 285), as did Dr. Huang (Dkt. No. 51 at 550–51). But Dr. Kaylani claimed that Grodman did not disclose his ADHD until his third year—after he had reported "outgrow[ing]" his autism as a child. Dkt. No. 45-1 at 54–55, 103.

This dispute is immaterial. Even if Grodman could show that the program was aware of his disabilities, it does not follow that the program would have been aware of his limitations and possible accommodations. *See Taylor*, 93 F.3d at 164 ("[I]t is important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any limitations experienced by the employee as a result of that disability."). The distinction is critical: federal law "requires employers to reasonably accommodate limitations, not disabilities." *Id.* There is no indication that the specific accommodations that would allow Grodman to adequately serve in the clinical environment were obvious to Texas Tech. *See* Dkt. No. 51 at 95 (Grodman admitting after being put on probation that he should have requested accommodations). And Texas Tech was not required to "disregard" Grodman's disabilities or compromise its expectations for third-year residents just so Grodman could continue to provide patient care that—by all accounts—was dangerous. *Se. Cmty. Coll.*, 442 U.S. at 405.

At bottom, Grodman has not pointed to evidence showing that Texas Tech was obviously aware of specific accommodations that would eliminate any concerns about his

patient care.  At most, he identifies statements from program administrators indicating that they were aware of his disabilities and, perhaps, his accompanying limitations.  Dkt. No. 50 at 19–20.  But that is not enough.  *Windham*, 875 F.3d at 238.  Thus, the Court concludes that no rational jury could find that the "open, obvious, and apparent" exception applied. For that reason, too, the Court grants summary judgment to Texas Tech on Grodman's failure-to-accommodate claim.

### B.    Retaliation

That leaves Grodman's retaliation claim.  In evaluating retaliation claims under the Rehabilitation Act, the Fifth Circuit applies the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 585 (5th Cir. 2021); *Shannon*, 2001 WL 1223633, at *3.

Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of retaliation.  *Cohen v. Univ. of Tex. Health Sci. Ctr.*, 557 F. App'x 273, 277 (5th Cir. 2014).  The prima facie case has three elements: (1) the employee engaged in an activity protected by the Rehabilitation Act; (2) his employer took an adverse employment action against him; and (3) a casual connection existed between the adverse employment action and the protected activity.  *Calderon v. Potter*, 113 F. App'x 586, 592 (5th Cir. 2004). Although it is not dispositive, *Mooney v. Lafayette Cnty. Sch. Dist.*, 538 F. App'x 447, 454 (5th Cir. 2013), temporal proximity between the protected activity and the adverse employment action is often used to establish the casual connection for the prima facie case of retaliation. *See, e.g.*, *Milteer v. Navarro County*, 652 F. Supp. 3d 754, 766–67 (N.D. Tex. 2023).  Typically, for a plaintiff to meet his initial burden based on temporal proximity, the protected activity

and adverse action must be "very close" in time.  *See Lyons*, 964 F.3d at 305 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).

If a plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Calderon*, 113 F. App'x at 592.  Once the defendant offers such a reason, "the burden shifts back to the plaintiff to show that the adverse action would not have occurred 'but for' the protected activity."  *Id.* (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996)).

###### i.    There is an absence of evidence establishing a prima facie case of retaliation.

Grodman's retaliation claim stumbles at the first step of the *McDonnell Douglas* framework.  True, Grodman engaged in protected activity by seeking formal and informal accommodations, and the program took adverse employment actions by (among other things) placing him on probation and ultimately terminating him.  *See, e.g.*, *Tabatchnik v. Cont'l Airlines*, 262 F. App'x 674, 676 (5th Cir. 2008).  But on the third prong of the prima facie case, no rational jury could find based on the summary-judgment evidence that there was a causal connection between Grodman's requests and the program's adverse actions.

Here, temporal proximity is key.  According to Grodman, he informally requested accommodations as early as his first year in the program.  Dkt. No. 51 at 8 ¶¶ 10, 12; *see* Dkt. No. 45-1 at 15.  The adverse employment actions did not begin, however, until December 2021, well into Grodman's third year.  *See, e.g.*, Dkt. No. 51 at 88–90.  That gap in time is too vast to establish a casual connection between Grodman's informal requests and the adverse employment actions.  *See, e.g.*, *Harmon*, 158 F.4th at 615 ("[A] temporal gap of around seven months, without more, is insufficient.").

Grodman's request for formal accommodations does not change the analysis. Although the request and the CCC's decision to recommend Grodman's termination were close in time, the CCC was not aware of the request until after it made its decision. The CCC voted to recommend Grodman's termination on January 4, 2022. Dkt. No. 45-1 at 158–61. Grodman intimated earlier that he would formally request accommodations. Dkt. No. 51 at 98. However, the CCC did not learn of the actual request until January 5, the day after it made its recommendation to the Dean. *Id.* at 110–11; *see* Dkt. No. 45-1 at 170. Thus, Grodman's formal request cannot be viewed as the impetus for the CCC's termination recommendation. Without more, Grodman's claim cannot proceed.

### ii. Texas Tech has met its burden to demonstrate legitimate, nondiscriminatory reasons for its actions.

Even if there were fact issues about whether Grodman has established a prima facie case of retaliation, there is no genuine dispute that Texas Tech has provided legitimate, nondiscriminatory reasons for Grodman's adverse employment actions. In fact, Grodman hardly contests this point. His brief offers two conclusory sentences supporting the assertion that Texas Tech has not met its burden under *McDonnell Douglas*. *See* Dkt. No. 50 at 30–31. It is no wonder why. The record describes a litany of uncontested patient-care failures and unprofessional incidents that formed the basis for Grodman's termination. *See, e.g.*, Dkt. Nos. 45-1 at 433–34; 51 at 77–79. And Grodman's termination letter makes clear that he was being recommended for dismissal based on poor patient care and unprofessional conduct. Dkt. No. 51 at 113–14. Texas Tech has therefore satisfied its evidentiary burden at step two of the *McDonnell Douglas* framework. Just as Grodman fails to point to evidence of a factual dispute in the "qualified individual" analysis (*see supra*, § 3.A.i), he does not identify such a dispute with respect to the nondiscriminatory nature of his termination.

– 28 –

### iii.    There is no genuine factual dispute as to pretext.

Finally, there is a lack of evidence supporting Grodman's argument that Texas Tech's stated reasons for terminating him were pretextual. A plaintiff bringing a retaliation claim under the Rehabilitation Act must show that his "protected act was a but-for cause of [his] termination." *Harmon*, 158 F.4th at 608 (citing *January v. City of Huntsville*, 74 F.4th 646, 654 (5th Cir. 2023)). The but-for causation standard requires a showing that the "unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Put another way, "even if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct." *Long*, 88 F.3d at 305 n.4.

Again, the record evidence of Grodman's deficient patient care does much of the work. Grodman must rebut each nondiscriminatory or nonretaliatory reason articulated by Texas Tech, *January*, 74 F.4th at 654, and yet he does not offer more than a "scintilla" of evidence to undercut Texas Tech's stated reasons for his dismissal. *Little*, 37 F.3d at 1075. Instead, Grodman focuses on other evidence that he says establishes the program's discriminatory motive and its unwillingness to comply with its own internal policies. *See* Dkt. No. 50 at 32–36. For example, he points to Dr. Kaylani's statement labeling him a "dangerous resident," and he emphasizes that the program suspended and terminated him only days into the probationary period. *Id.* at 33–37 (quoting Dkt. No. 51 at 79). This evidence does not move the ball. Even if the "dangerous resident" comment is some

– 29 –

evidence of animus, Grodman still has not rebutted the justification for his termination: his deficient patient care.  *See January*, 74 F.4th at 654.

Grodman's complaint about the disciplinary timeline is also misplaced.  Although his probation letter noted that the CCC would review his status in 90 days, it also explained that "any unsafe patient practice or unprofessional incidents" during the probationary period "may result in the recommendation that [he] be dismissed immediately from this program," a proviso that Grodman largely ignores.  Dkt. No. 51 at 90.  It was only after Grodman made additional mistakes during the probationary period that the program suspended him and began the march towards termination.  *See, e.g.*, Dkt. No. 45-1 at 433. Thus, the disciplinary timeline does not evince a genuine factual dispute as to pretext.

## 4.    Conclusion

For the reasons above, no genuine dispute of material fact remains as to Grodman's claims under the Rehabilitation Act.  Texas Tech is entitled to judgment as a matter of law. The Court grants Texas Tech's motion for summary judgment (Dkt. No. 44).  Because the Court's decision resolves all remaining claims in this matter and obviates the need for a trial, Texas Tech's *Daubert* motions (Dkt. Nos. 42; 43) are moot.

A final judgment will enter separately.

So entered on December 29, 2025.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE